OPINION OF THE COURT
Kristin Booth Glen, J.
In 1791, the drafters of the Fourth Amendment were concerned to prevent those hated “general searches” of citizens’ homes by the King which had characterized the colonies prior to the revolution. In 1984, concerns for the protection of privacy are more frequently directed to the increasing bureaucratization of government and unsupervised administrative power than to overt misconduct by the police. The language of the Fourth Amendment is, however, broad enough to cover both these threats to privacy. As the Supreme Court wrote in Boyd v United States (116 US 616), the Fourth Amendment applies “to all invasions on the part of the government and its employés *1067 * * * It is not the breaking of [a man’s] doors, and the rummaging of his drawers, that constitutes the essence of the offence [síc]; but it is the invasion of his indefeasible right of personal security, personal liberty and private property” (supra, at p 630, cited in Mapp v Ohio, 367 US 643, 646-647).
And, as Justice Burger later wrote, “[T]he Framers were men who focused on the wrongs of the day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth.” (United States v Chadwick, 433 US 1, 9.)
These cross motions involving a subpoena duces tecum issued by an administrative officer, the Commissioner of Investigation of the City of New York (the Commissioner), raise important questions concerning the applicability of Fourth Amendment protections to so-called “office subpoenas”. The body of cases which deals with such subpoenas has, at least until recently, left constitutional considerations relatively unarticulated, so that a review of the law is necessary to determine the legal and constitutional principles which should be employed in this case.
THE FOURTH AMENDMENT
The Fourth Amendment provides that “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause”. (US Const, 4th Arndt.)
A. WARRANTS
As a matter of both Federal and State constitutional law, this language has been read to mean that a search without a warrant — that Is, without a prior finding of probable cause by a neutral magistrate — is per se unreasonable except within a few well-defined exceptions.[1] (See, e.g., United States v Martino, 664 F2d 860; Matter of B. T. Prods. v Barr, 44 NY2d 226.)
*1068 The Fourth Amendment is not confined to actions by the police, but extends as well to administrative agencies whose purposes are other than the investigation or detection of criminal law violations. (See, e.g., Marshall v Barlow’s, Inc., 436 US 307; Camara v Municipal Ct., 387 US 523.) While the traditional criminal law quantum of probable cause — that a crime has been committed and that evidence, fruits or instrumentalities of that crime may be found in a particular place —= may not apply to such administrative agencies, they must still demonstrate the reasonableness of and necessity for the search. One reason for this requirement is to guard against otherwise unbridled “discretion to invade private property”. (Camara v Municipal Ct., 387 US, at p 532.) Thus, for example, the Fourth Amendment is violated by a State law which requires that the records of an abortion clinic be open to governmental inspection at all times. (Margaret S. v Edwards, 488 F Supp 181, 217.)[2]
B. SUBPOENAS
While the Fourth Amendment would, by its terms, appear applicable to any governmental search of a person’s “papers or effects” wherever that search takes place, a different standard has evolved for analyzing “searches” conducted outside the person’s home„ or office[3] when a neutral body demands the production of the person or her/his papers or effects for investigatory purposes. The body of law detailing the protections available in such instances derives primarily — and significantly[4] — from the subpoena power of the Grand Jury.
*1069 (i) GRAND JURY SUBPOENAS
Because the Grand Jury is entitled to “every man’s evidence” the Supreme Court has held that its testimonial subpoena does not constitute a “seizure” for Fourth Amendment purposes. (Dionisio v United States, 410 US 1.) Nor does the taking of physical characteristics from a witness constitute an impermissible “search”. (Dionisio v United States, supra [voice exemplars]; United States v Mara, 410 US 19 [handwriting exemplars].) Where, however, the materials are sought by a subpoena duces tecum, the Fourth Amendment’s prohibition against unreasonable searches and seizures again comes into play (e.g., Hale v Henkel, 201 US 43),[5] such that a challenge for over-breadth or relevancy may be made. (See, e.g., Matter of Grand Jury Proceedings, 486 F2d 85.)[6]
Where there are special circumstances tending to show that the Grand Jury is not acting within its general investigatory function, but for some other purpose, judicial examination of its subpoenas requires substantially greater scrutiny. (See, e.g., Branzburg v Hayes, 408 US 665, 707-708 [upholding testimonial subpoenas to reporters in the face of a First Amendment challenge, but noting that judicial control of the Grand Jury process is available if that process were misused to harass the press].) Thus, where the Grand Jury uses its subpoena power not for the purpose of a general criminal investigation, but to gather evidence for a civil enforcement proceeding (Matter of Grand Jury Subpoenas, April, 1978, at Baltimore, 581 F2d 1103), or to gather evidence for cases in which indictments have already been issued (e.g., United States v Doe, 455 F2d 1270), the subpoenas will be quashed.
*1070 (fi) OFFICE SUBPOENAS
Still further along the Fourth Amendment continuum are subpoenas duces tecum issued by administrative agencies, or as they are commonly known, “office subpoenas”. While Federal decisions, relying on two early Supreme Court cases[7] frequently treat office subpoenas as similar to Grand Jury subpoenas for Fourth Amendment purposes[8], our Court of Appeals has held there is a “fundamental distinction between a nonjudicial, ‘office’ subpoena and a Grand Jury subpoena.” (Virag v Hynes, 54 NY2d 437, 441.) This is so not only because of the difference in subpoenaing bodies, but also because, in the case of office subpoenas, there is no “direct judicial supervision.” (Supra, p 441.) Thus, unlike the Grand Jury situation, when an office subpoena is challenged, the burden is on the issuer “to come forward with a ‘factual basis’ which establishes * * * relevancy” before a person can be compelled to turn over the subpoenaed materials. (Supra, at p 442.)
Office subpoenas are said to be subject to the requirements of relevance and materiality, but it is clear that in the ordinary case — i.e., a purely investigatory administrative situation — there is no necessity for any showing of probable cause such as the Fourth Amendment requires for a criminal or civil warrant. What explains these differences in restraint on the State compelled, involuntary production of a person’s “papers and effects” when the Fourth Amendment makes no distinctions as to the form of *1071 State interference save its reasonableness or unreasonableness?[9]
Several recent decisions of the New York Court of Appeals have created an analytic framework in which to understand these distinctions. They also suggest when, even in the context of administrative subpoenas, a stricter standard may be required. What these cases do, in fact, is to generally differentiate subpoenas duces tecum from warrants on the basis that the former, unlike the latter, do not involve taking possession, and thus are not deemed “seizures” for Fourth Amendment purposes.[10] An additional, and equally critical differentiation made by the court is the purpose for which subpoenas (as opposed to warrants) are generally employed — investigatory rather than evidence gathering — in a civil rather than a criminal context.
CRITERIA IN EVALUATING ADMINISTRATIVE SUBPOENAS A. SEIZURES
In Matter of Heisler v Hynes (42 NY2d 250, rearg den 42 NY2d 1015) and Matter of Windsor Park Nursing Home v Hynes (42 NY2d 243, rearg den 42 NY2d 1015), the Court of Appeals held that neither a Grand Jury subpoena (Matter of Heisler v Hynes, supra) nor an office subpoena (Matter of Windsor Park Nursing Home v Hynes, supra [involving a Special Prosecutor]) can be used to compel a witness to surrender possession of records or other property to a prosecutor for retention and independent inspection. The court found that “[t]here are significant contrasts between the power of subpoena, on the one hand, and that of impoundment or inspection, on the other” (Matter of Heisler v Hynes, supra, at p 253) and that authorization for the *1072 latter is not inherent in the subpoena power. Such authorization, “if [ii] be constitutionally valid” must, the court held, come from the Legislature. (Supra, at p 254; emphasis added.)
The Legislature responded swiftly to Heisler (supra) and Windsor Park (supra) by enacting an integrated package involving CPLR 2305, section 215.70 of the Penal Law, subdivision 8 of section 63 of the Executive Law, CPL 190.25 and CPL 610.25.[11] The Court of Appeals reviewed these new statutes in Matter of Hynes v Moskowitz (44 NY2d 383) where it considered claims, inter alia, “that the challenged statutes are violative of the Fourth Amendment proscription against unreasonable searches and seizures in authorizing the seizure and retention of subpoenaed materials without a showing of probable cause.” (Supra, at p 394.)
In its discussion of the different preliminary showings required by the Fourth Amendment for search warrants and Grand Jury or office subpoenas the court made the following critical distinction. It wrote “a search warrant, unlike the subpoena, is not a preliminary investigatory tool, but is rather a device for obtaining evidence intended to be used against a defendant where probative support of his guilt is already known to the authorities. Clearly, the concerns which require that constitutional protections attach when a warrant issues do not apply equally when an investigatory subpoena duces tecum is served. Hence, ‘a subpoena to appear before a grand jury is not a “seizure” in the [constitutional] sense, even though that summons may be inconvenient or burdensome.’ (United States v Dionisio, 410 US 1, 9.)” (Supra, at pp 394-395.)
Accordingly, the statutes in question, which relate to precisely those “preliminary investigating tools” described by the court, were held facially constitutional.
*1073 B. PURPOSE
Moskowitz (supra) suggests, however, that where the purpose of the subpoena is not investigatory, but rather to obtain evidence for use against a person the authorities already believe guilty of criminal activity, courts must apply a different standard than the “good cause” of CPL 610.25 and CPLR 2305.
A recent Court of Appeals decision, while not involving subpoenas, reinforces this view. In Matter of Abe A. (56 NY2d 288) the question was whether a court had inherent power to compel a person, whose status was “no more than” a criminal suspect, to supply nontestimonial evidence — in that case a blood sample. While finding there was no power to authorize detention of the suspect for purposes of obtaining the evidence, the court noted that it did have the power to issue a search warrant. The court then drew an analogy between that power and the power to seize evidence based on a showing of probable cause and sustained the seizure of the evidence.[12]
Reading these cases together demonstrates a Fourth Amendment continuum in which the degree of preliminary showing for governmental interference with property depends on the purpose for which the material sought is to be used, i.e., from probable cause required for the “seizure” of evidence of a crime to a minimal showing of relevance and materiality for inspection in a preliminary or routine noncriminal investigation.[13] In this analysis, the instrument by which the material is sought is not dispositive of the Fourth Amendment claims, although it will generally indicate where on the spectrum the demand should be placed. That is to say, a “warrant” will require a different preliminary showing depending on whether it is criminal or administrative, as will a subpoena duces tecum depending on whether it has been issued by a Grand Jury, or an administrative agency. Equally important in determining *1074 spectrum location is the purpose — investigatory or evidence gathering — for which a subpoena has been issued.[14]
Indeed this is precisely the purpose of and necessity for judicial review of all such instruments. The timing of the review is determined by the nature of the instrument — prior to issuance of a warrant, or only upon a request for judicial compulsion in the case of subpoenas[15] — but our constitutional scheme demands that there be judicial consideration of the requirements of the Fourth Amendment whenever the government “searches”, inspects, impounds or otherwise interferes with a person’s property.
Put another way, the requirements of relevancy and materiality are themselves instantiations of the Fourth Amendment’s reasonableness test which are more or less strictly applied depending upon where in the spectrum of intrusion the governmental demand is located. The greater the intrusion, the higher degree of relevancy and materiality must be shown to satisfy the test of reasonableness. Thus, where the police seek to search a home, the basis for, or materiality of, the search must be great, as must the relevance of the materials sought. Translating the probable cause requirement applicable in such a situation to *1075 terms of relevance and materiality, the proposed intrusion can only be justified if the things and documents sought are material to a crime which has been committed, and relevant in that they are either the fruits of or instrumentalities of the crime, or evidence of it. Conversely, the degree of relevance and materiality required at the other end of the spectrum may be far less, and yet still constitute “reasonableness” in Fourth Amendment terms. (Cf. South Dakota v Opperman, 428 US 364, 370, n 5.)
A reading of the New York cases on administrative or office subpoenas exemplifies and fully supports this understanding.
The general requirements for a nonjudicial subpoena were set out in Matter of A’Hearn v Committee on Unlawful Practice of Law of N. Y. County Lawyers’ Assn. (23 NY2d 916). The court held that an agency asserting its subpoena power must show its “authority [the] relevancy [of the items sought] and some basis for inquisitorial actions”. (Supra, at p 918.) Furthermore, in issuing a subpoena duces tecum, “no agency of government may conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered” (p 918). Accordingly, the showing of basis, or materiality, to be made must be related to the breadth of the inquiry and the extent of the investigation preceding the subpoena. (Supra, at pp 918-919.) Two cases which followed A ’Hearn explored what constitutes a permissible showing of materiality.
In Liberty Mut. Ins. Co. v City of New York Comm, on Human Rights (31 NY2d 1044), the court indicated that the outer limits had been reached. It sustained a loosely drawn complaint which, however, was based on an objective pattern of discriminatory employment practices shown by statistical evidence. In Myerson v Lentini Bros. Moving & Stor. Co. (33 NY2d 250), the court found that those “outer limits” had been crossed, and quashed a subpoena based only on Commissioner’s Myerson’s affidavit that “she had received ‘numerous complaints’, a large percentage of them accusing Lentini of gross disparities between estimates and actual billings.” (Supra, at p 259.) Because the Judge reviewing the subpoena had no way of assessing *1076 the “nature and reliability” of these complaints, the court wrote that “in this case, as was bordered upon in the A’Hearn case, the scope of relevancy and materiality overlaps with the risks and possible fact of unjustified harassment. Less of a showing should be required for a preliminary or tentative inquiry, and more for one that might otherwise be causelessly broadened into an unlimited examination of the business affairs of an enterprise” (supra, at p 260).
The relationship between materiality and relevancy is demonstrated in Nicholson v State Comm. on Judicial Conduct (67 AD2d 649) where the Commission made a sweeping request for virtually all documents relating to a 1977 judicial campaign. The alleged basis for the inquiry was a complaint as to a single fund raiser during the campaign. The Appellate Division held that the documents sought were outside the bounds of that complaint, depriving the Commission of jurisdiction for its demand and raising serious questions of relevancy. In holding the subpoena in abeyance, the court wrote “The commission may not use the subpoena as a vehicle for obtaining information to enable it to make a preliminary showing of authority, relevancy or basis for inquiry.” (Supra, at p 651.)
Inquiry into the relevance of material sought goes not only to the scope of the investigation, but to a proper purpose. As one New York Supreme Court Justice wrote: “Where the investigation has been converted from its original lawful purpose of investigating living costs to one of another purpose, i.e., to conduct an investigation to find criminal acts, the abuse of process would be sufficiently clear to warrant quashing these subpoenas.” (Matter of Temporary State Comm. on Living Costs & Economy v Bergman, 80 Misc 2d 448, 453, citing Matter of Quinn v Lane, 36 Misc 2d 2.)
Where there is evidence[16] that the relevance of the materials sought is not to an administrative investigation, but “in preparation or in aid of a criminal prosecution, not within the purview of [the agency’s] jurisdictional powers, *1077 the subpoena will be quashed”. (Matter of Temporary State Comm. on Living Costs & Economy v Bergman, supra, at p 453, citing Matter of Grand Jury Proceedings, 485 F2d 85, supra; Branzburg v Hayes, 408 US 665, supra; Boren v Tucker, 239 F2d 767, 772.)
Thus the cases come full circle. The court’s inquiry, while couched in terms of materiality and relevancy, must always be grounded in the Fourth Amendment’s requirement of reasonableness. This in turn depends upon the particular circumstances in which the governmental demand arises. Is the purpose criminal or civil, and if the latter, is it part of a general regulatory scheme or a particular investigation? Is the material sought for purposes of information, accusation, or as evidence in a criminal case? The more general, preliminary and nonaccusatory the investigation and the request, the less the government must show to meet the reasonableness standard. Conversely, when the investigation is in its final stage, aimed at a particular individual or entity, and the material is sought for use as evidence in a criminal prosecution, the government must make the strongest requisite showing, that is to say, no less than probable cause itself. With these general principles in mind, the facts of this case may now be considered and the showing made by the Commissioner properly evaluated.
FACTS[17]
Plaintiffs Harlem Teams for Self-Help, Inc. (Harlem Teams), and Teams Civic Services, Inc. (Teams Civic) are not-for-profit, social service organizations serving the Harlem-North Manhattan area.[18] Plaintiff Fred Wallace is Executive Director of Harlem Teams and President (part time) of Teams Civic, receiving a salary of $28,000 from *1078 the former and $12,000 from the latter. Both organizations receive the bulk of their income from governmental funding sources. Harlem Teams is reimbursed by the Community Development Agency of the City of New York (CDA) for costs of approved social service programs. Teams Civic receives fees from the city’s office of Home Care of the Human Resources Administration (HRA) which administers the Federally funded Medicare program. As a condition of this funding, all records (including personnel records)[19] are open to agency audit, and must indeed be reviewed and approved prior to reimbursement. Over the years of the two organizations’ operations, it is alleged that Harlem Teams has always been reimbursed for the salary paid to Wallace and CDA has never posed any objection to his work; likewise HRA has consistently approved Wallace’s receipt of his part-time salary. Petitioners claim, without rebuttal, that Wallace works in excess of the number of hours required for his job lines at each of the two organizations.[20]
For reasons unknown to petitioners, and unstated by respondents, the Inspector General of HRA (through respondents Ehrenreich and Gray) commenced an investigation, apparently into some alleged impropriety involving Wallace’s salary.[21] Without speaking to anyone at Harlem Teams or Teams Civic, inspecting the organizations’ records or speaking with Wallace,[22] the investigation was apparently closed with an apparent finding of wrongdoing *1079 by Wallace.[23] This “finding”, which has not been made known either to petitioners or to the court, was then referred to the respondent Commissioner of Investigation Patrick McGinley (the Commissioner) who commenced investigation No. 1080/82D.
Respondent Bruce Kato of the Commissioner’s office contacted Wallace requesting his appearance, later stating to Wallace’s attorney that the Inspector General’s finding did not involve criminal conduct, but rather a contract violation. On August 8, 1982, after a series of letters between Kato and Wallace’s attorney,[24] and the issuance, withdrawal and reissuance of a subpoena ad testificandum, Wallace appeared for a hearing before Kato,[25] along with the chairman of Harlem Teams and its attorney. Kato then stated that the investigation did not involve the two corporate petitioners, that none of their books, records or transactions were the subject of the inquiry, and that the investigation was a personal and criminal one of Fred Wallace, for violation of unspecified sections of the Penal Code. The corporate petitioners and their attorneys were excluded from the hearing. Wallace was told that he had no right to know the complaint against him, that he must answer all questions put to him by Kato, and that Kato alone would rule on relevancy and materiality.
During the hearing[26] Wallace testified fully about the operation of the two agencies, their funding, job lines, his *1080 work, and certain loan transactions[27] between the agencies. He indicated there, as he does in the papers supporting the instant motion, that all facts on which he was questioned were fully known to the city, having been documented in audits which both CDA and HRA had previously approved.
After the hearing was closed, on October 22, 1982, Teams Civic received a demand for the originals of its canceled checks relative to the loan transaction. It determined to furnish photocopies and so informed Kato, who demanded the originals, on the ground that the copies might have been altered. Kato was offered an opportunity to come to Harlem Team’s offices to compare the originals,[28] but refused and thereafter issued the subpoenas which are the subject of these cross motions.
THE SUBPOENAS
Two subpoenas were issued October 28, 1982, to Jeff L. Greenup, as general counsel for Harlem Teams and for Teams Civic. Both call for the production of original time sheets from January, 1980 to August, 1982, for petitioner Wallace and two other employees, and for original canceled checks relating to loans from Teams Civic to Harlem Teams for the fiscal year prior to 1981-1982. In addition, the subpoena of Teams Civic includes: “The original Board of Directors Board minutes or records for Board meetings held for the fiscal year prior to 1981/82”.
The subpoenas, which are “signed”[29] by respondent Leopold, the First Deputy Commissioner of Investigation, state only that the appearance and documents are required “in the matter of an investigation relating to the affairs, functions, accounts, methods, efficiency or personnel of Human Resources Administration.”
*1081 The affidavit of the Commissioner in support of the motion to compel adds little to this bald assertion of authority[30] and contains no additional information going either to materiality, i.e., the basis of the investigation of HRA’s “affairs, functions”, etc., nor to relevance, i.e., the connection between the subpoenaed documents and the investigation, except to state that there are “allegations of contract irregularities by Petitioner.” Further, as already discussed, the Commissioner has refused petitioners’ offers of certified copies and an opportunity to inspect the originals, but has insisted that the originals must be produced.
petitioners’ claims
Petitioners argue that the subpoenas are improper, unlawful, and unconstitutional on several grounds. They attack the subpoenas as overbroad and as a “fishing expedition” lacking the requisite probable cause, and dispute the Commissioner’s power and authority to conduct a “personal criminal investigation” of petitioner Wallace. They claim that the subpoenas and their stated purpose of “an investigation of HRA” are deliberately misleading, given respondents’ concessions, and thus unlawful. As to the apparent criminal investigation, petitioners argue that the Commissioner’s insistence on originals demonstrates his intent to use the documents for evidence in a criminal prosecution. Finally they allege that the entire investigation is racially motivated, and is part of a general scheme to undermine and/or destroy black social service agencies in this city.[31]
*1082 DISCUSSION
The motion and cross motion invoke the court’s power to supervise administrative subpoenas duces tecum and require judicial review of their compliance or noncompliance with the requirements of the Fourth Amendment. Allegations of First Amendment violations have also been made, but because the subpoenas are otherwise unlawful, for the reasons below, that issue need not be reached here.[32]
In locating the instant subpoenas on the Fourth Amendment continuum previously discussed, it is clear that this is more than a preliminary civil investigation. The circumstances support petitioners’ contention, conceded by respondents, that this is indeed a criminal investigation of an individual, the petitioner Wallace, whom the subpoenaing authorities already suspect of having committed a crime or crimes. Clearly the police could not enter petitioners’ premises and obtain the documents requested without a warrant based on probable cause (cf. Zurcher v Stanford Daily, 436 US 547). Yet, in essence, this is what the Commissioner seeks through his issuance of the instant subpoenas.
Whatever showing may be necessary here, whether of actual probable cause or something less, it clearly has not been made. Indeed the subpoenas and the Commissioner’s affidavit utterly fail to demonstrate even that degree of materiality and relevancy which would be required in a true administrative proceeding. (See, e.g., Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250, supra;[33] Liberty Mut. Ins. Co. v City of New York Comm, on Human Rights, 31 NY2d 1044, supra.)
Further, under the circumstances of this case, the most reasonable conclusion which can be drawn from the Commissioner’s demand for originals is that their prospective
*1083 use is as evidence in a criminal trial against Wallace. (See, e.g., Matter of Temporary State Comm, on Living Costs & Economy v Bergman, 80 Misc 2d 448, supra.) The subpoenas must therefore be quashed under the rationale of that case and other cases limiting the power of office subpoenas in this regard. (See, e.g., Matter of Heisler v Hynes, 42 NY2d, at p 258 [dissenting opn of Jasen, J.].)[34]
Accordingly, on the record as it stands, the motion to quash the subpoenas is granted, and the cross motion seeking enforcement is denied.

. These include the so-called automobile exception (United States v Ross, 456 US 798; People v Longen, 60 NY2d 170); the “grab area” around an arrested person (Chimel v California, 395 US 752; People v Smith, 59 NY2d 454); objects in plain view (e.g., Texas v Brown, 460 US —, 103 S Ct 1535); searches incident to lawful arrest (Rawlings v Kentucky, 448 US 98; People v Landy, 59 NY2d 369). None of the exceptions is relevant to a discussion of subpoenas duces tecum.

. Within the general area of administrative searches, a special area has been carved out for “pervasively regulated businesses” such as the sale of guns (see, e.g., United States v Biswell, 406 US 311), or “required records” (e.g., Donovan v Mehlenbacher, 652 F2d 228) where warrants are not required for periodic noncriminal inspection. Margaret S. v Edwards (488 F Supp 181, supra), contains a discussion of these cases, finding them narrowly limited to the instances which the Supreme Court has previously denominated, and inapplicable to abortion clinics, even though the practice of medicine is itself highly regulated.

. In the clearly criminal area, of course, a person is deemed to have a lesser “expectation of privacy” in, say, a telephone booth, than in her/his home (see, e.g., Katz v United States, 389 US 347) and thus to be entitled to fewer, if any, Fourth Amendment protections. See, also, for example, cases on standing relating to car searches (e.g., Rawlings v Kentucky, 448 US 98) and property left with others (e.g., People v Ponder, 54 NY2d 160). These cases are, however, quite different from the investigatory search cases discussed infra, where a person does not choose to be in a less private place, but is required to be there, whether by police order (see, e.g., Davis v Mississippi, 394 US 721) or by subpoena or other legal process.

. As discussed infra, the Grand Jury has a peculiar and special place within constitutional law because of the historical understanding of it as a body which operated *1069 as both “sword and shield”. (See, e.g., Blair v United States, 250 US 273.) Although the reality of that characterization may be open to serious question (see, e.g., Frankel & Naftalis, The Grand Jury: An Institution On Trial [1977]; Clark, The Grand Jury [1975]; Note 7 Harv Civil Rights — Civil Liberties, L Rev 432; United States v Dionisio, 410 US 1 [dissenting opn of Marshall, J.]), it has been repeatedly invoked in determining that a Grand Jury subpoena does not constitute a seizure. (United States v Dionisio, supra [majority opn].)

. The court there held for the first time that a subpoena duces tecum ordering the production of “books and records” before a Grand Jury “may constitute an unreasonable search and seizure within the Fourth Amendment” (Hale v Henkel, 201 US, at p 76) and, on the facts of that case, found the subpoena was “far too sweeping in its terms to be regarded as reasonable” (p 76).

. Matter of Grand Jury Proceedings (486 F2d 85) marks the outer limits of the initial relevancy inquiry, as Hale (supra) apparently does for overbreadth, but it seems clear that, as a matter of Federal constitutional law, the principles of Hale are still good law.

. (See, e.g., United States v Tivian Labs., 589 F2d 49, cert den 442 US 942, citing United States v Morton Salt Co., 338 US 632 and Oklahoma Press Pub. Co. v Walling, 327 US 186.) Given their dates it is not surprising that neither Morton Salt nor Oklahoma Press contain any substantial discussion of the Fourth Amendment. It is also extremely important to note that those cases were decided prior to Warden, Maryland Penitentiary v Hayden (387 US 294) which, for the first time, permitted police seizure of evidence of a crime (as opposed to fruits or instrumentalities of a crime, or contraband) subject, of course, to the protections of the Fourth Amendment.

. The general rule is that a Grand Jury subpoena duces tecum will be deemed “reasonable” under the Fourth Amendment so long as: “(1) [it] commands the production only of things relevant to the investigation; (2) [it] specifies the items with reasonable particularity; and (3) [it] covers only a reasonable [portion] of time.” (Matter of Grand Jury Subpoena Duces Tecum [Dorokee Co.], 697 F2d 277, 281.) The test set forth in Oklahoma Press (supra) requires a government showing that:
(1) the investigation is authorized by Congress (i.e., that the subpoenaeing body has jurisdiction);
(2) the investigation is for a purpose Congress (or the administrative agency) can order;
(3) the evidence sought is “relevant”; and
(4) the request is adequate, but not excessive for the relevant inquiry. (Supra.)

. Although the Supreme Court’s noting of probable jurisdiction in Lone Steer v Donovan (565 F Supp 229, probable jurisdiction noted_US_, 103 S Ct 2451) suggested it might consider these issues (see Obermaier, White-Collar Crime: The Supreme Court — A Look Forward and Back, NYU, Nov. 1,1983, p 1, col 1), its recent decision Donovan v Lone Steer (— US_, 104 S Ct 769) simply reaffirms Oklahoma Press (supra), without any discussion of how the government’s burden of showing “reasonableness” may shift as its purposes and degree of intrusion change from purely administrative (as was clearly the case in Donovan v Lone Steer and Oklahoma Press Pub. Co. v Walling) to quasi or entirely criminal, as is the case here. See discussion infra.

. The cases do not specifically discuss the difference between warrants and subpoenas, but they supply the critical analytical distinctions, i.e., “seizure” which is missing in the general body of case law involving subpoenas and the Fourth Amendment.

. McKinney’s Practice Commentary to CPL 610.25 states:
“In what has to be one of the speediest legislative overrulings of a judicial determination in recorded history, these amendments were approved as law and became effective on July 19, 1977.
“The net purpose, assuming constitutionality of the new legislative package, is to permit the subpoenaing agency to retain in its possession books, documents and records for examination and audit.” (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, 1983-1984 Pocket Part, CPL 610.25, p 80; emphasis added.)

. Because a bodily intrusion was involved, the court went on to those further inquiries required by, e.g., Cupp v Murphy (412 US 291) and Schmerber v California (384 US 757, 770-772). (Matter of Abe A., supra, at pp 297-298.)

. This is analogous to the predicate-response continuum employed in analyzing various levels of street detention in “police-citizen encounters” short of arrest. (See People v De Bour, 40 NY2d 210.)

. An excellent example of the distinction based upon the use to which governmentally sought material is to be put may be found in United States v Toussaint (456 F Supp 1069). The court there found the Fourth Amendment had been violated when the IRS failed to comply with its own rules by having a revenue agent (who ordinarily makes routine civil audits) continue to collect evidence from a taxpayer once the service determined there was fraud, since only special agents were empowered to pursue criminal violations.

. The Fourth Amendment requirement of a prior judicial finding of probable cause for a warrant is premised on the degree of invasion of or intrusion on the privacy caused by a police search and seizure — an invasion which is not nearly so great when the material is obtained by legal process, outside of an individual’s home or business, at a mutually convenient time. As the Court of Appeals wrote in Moskowitz (44 NY2d, at p 394): “This constitutional guarantee seeks to balance the interests of society in discovering evidence of criminal activity with the right of the individual to be free from unjustifiable governmental intrusions. To be sure, an intrusion imposed on a person subject to a search and seizure is substantial. A search is conducted without advance notice and the scene of the search may be an individual’s home. Where resistance is encountered, the search may be effected by the threat or use of force. These considerations demand that a warrant issue only if supported by probable cause.” The court went on to say: “But these considerations do not apply with equal force to the Grand Jury subpoena duces tecum * * * It is served in the same manner as any other legal process, and may be challenged, before compliance, in a motion to quash * * * If the motion to quash is denied and compliance ordered, no search is conducted, nor is there a threat or actual use of force * * * It should also be noted that a search warrant, unlike the •subpoena, is not a preliminary investigatory tool, but is rather a device for obtaining evidence intended to be used against a defendant where probative support of his guilt is already known to the authorities.” (Supra, at pp 394-395.)

. In the Bergman case (supra), there was evidence that the Commissioner had improperly disseminated information from the hearings which were in progress and had indicated that he was seeking to make a criminal case against the subpoenaed witnesses.

. The “facts” discussed below are taken from affidavits submitted by petitioners and from the transcript of the hearing at the Commission on Investigation. While they may or may not be self-serving, they have not been rebutted or otherwise questioned by respondents, and so are accepted as true for purposes of these motions. Where petitioners have drawn conclusions or otherwise speculated from the facts, their surmises are described as “alleged” or “apparent.”

. Harlem Teams is a generalized, multipurpose social service organization which has been in existence for some 20 years. Teams Civic is an offshoot of Harlem Teams, which was separately incorporated in 1979, at the request of the city. Teams Civic provides home care attendant service to elderly homebound Medicaid recipients on a fee-for-hourly service basis. Together, the organizations employ approximately 600 persons, almost all of whom are black.

. According to petitioners, CDA has negotiated and approved Wallace’s position at Harlem Teams and authorized $28,000 as compensation for the line which he occupies. HRA has approved Wallace’s occupancy of the job as part-time President of Teams Civic, with the time budgeted at $40,000 but with a part-time salary budget and set aside of $12,000 which Wallace receives.

. Harlem Teams defines full time as 30 hours per week or more; Teams Civic defines part time as 9-10 hours per week. Wallace’s unrebutted affidavit and testimony at the hearing held at the Department of Investigation demonstrate that he works more than those hours per week for each organization. Petitioners also allege that neither CDA nor HRA has any rule or definition of full- and part-time work which is contrary to their practice.

. The only information about any investigation which petitioners ever seem to have received was in a letter from Robert Schick, Director, Division of Home Attendant Conduct Services, HRA, dated June 23,1982, which is appended to their moving papers. This is, however, far from notice by the investigating authority and substantially predates the commencement of the Commissioner’s investigation which resulted in the instant subpoena.

. Wallace was contacted by phone, but when, under advice of counsel, he refused to meet with Ehrenreich and Gray until he was told the nature of the investigation, the investigation was terminated with an apparent “guilty” finding.

. This was confirmed by a telephone call to Wallace from Robert Schick, who read a letter from the Inspector General’s office stating that Wallace’s “explanations” of his part-time salary from Teams Civic were unsatisfactory, and that his receipt of that salary was improper. Wallace, in a sworn affidavit, denies having given any “explanations”. Petitioners’ subsequent attempts to confirm or obtain a copy of the letter read by Schick have been unsuccessful.

. In the course of these letters Kato apparently withdrew his prior representations about the nature of the investigation. The various charges in position and issuance of the subpoenas, when a voluntary appearance had been agreed to, are claimed to constitute examples of respondents’ bad faith.

. Wallace states he did so, despite his trepidations about the whole procedure, because he believed the pendency of the investigation threatened the contracts of both agencies and, therefore, the livelihood of their 600 employees. There was, at the time of the hearing, some impairment of the contract between Teams Civic and HRA. Wallace claims that subsequent to his testimony the Inspector General and respondent Leopold went to CDA with the result of impairing its contract not only with Harlem Teams, but also with a third agency with which Wallace had an unsalaried relationship, Citizens Care Committee, Inc.

. Wallace had requested and apparently been promised a copy of the hearing transcript, but it was not produced until oral argument on the instant motion on March 30, 1983.

. Wallace explained the transactions as transfers from Teams Civic to Harlem Teams due to the latter’s shortfall when CDA was some 4-5 months late reimbursing it. The transactions were accomplished by checks, there was no commingling, and the “loan” was repaid to Teams Civic as soon as Harlem Teams received its CDA reimbursement. The transactions were recorded in the books of both organizations which were, of course, subject to and audited by the city.

. This same offer, with the addition of a certification by Harlem Teams’ attorney, was made at oral argument, but again refused.

. According to petitioners, the originals were not signed but merely had Leopold’s name typed in. Only after a complaint by Mr. Greenup were his “signatures” added, thus invalidating the subpoenas. Since the subpoenas are otherwise defective, this issue need not be determined here.

. The Commissioner’s authority is based upon chapter 34 of the New York City Charter, particularly subdivision b of section 803 thereof which provides that: “[T]he commissioner is authorized and empowered to make any study or investigation which in his opinion may be in the best interests of the city, including but not limited to investigations of the affairs, functions, accounts, methods, personnel or efficiency of any agency.” The language of the subpoena basically tracks the language of that section, which is also cited in the Commissioner’s affidavit and accompanying memorandum of law. The Commissioner’s power to investigate “corrupt or other criminal activity, conflicts of interest, unethical conduct, misconduct or incompetence ***by persons * * * doing business with or receiving funds directly or indirectly from the City” is derived from Executive Order No. 16, July 26, 1978.

. Petitioners argue that, since his election in 1977, and based on charges made during that campaign, Mayor Koch has targeted black social service agencies as “patronage dumps for black politicians” run by “poverty pimps” and “poverticians”. Petitioners further allege that Koch acted upon his campaign promises to shut down such agencies first by closing out all model cities contracts which supported such agencies. Subsequently, they argue, he established the Office of Inspector General of HRA to investigate black social service organizations and to terminate their contracts with the city or to create sufficient suspicion from such investigations as to impair or *1082 destroy their contracting ability.

. The claims made by petitioners, described in part in footnote 31 above, would appear, if true, to raise issues concerning the freedom of association protected by the First Amendment, which would be cognizable in a proceeding such as this (cf. Branzburg v Hayes, supra), as well as civil rights violations which might be cognizable in a Federal action brought pursuant to section 1983 of title 42 of the US Code.

. Here there is no statistically supported pattern which falls within the “other limits” of Liberty Mutual [supra), and there is not even that allegation of specific complaints concerning Wallace or the organizational petitioners which was deemed insufficient in Myerson (supra).

. Disputing the majority’s holding that the Grand Jury has no inherent power to retain subpoenaed records, Judge Jasen carefully distinguished office subpoenas in writing: “The cases that hold that a subpoena duces tecum may not be used to ascertain the existence of evidence have no application to Grand Jury subpoenas. (Compare People v Coleman, 75 Misc 2d 1090; Matter of Saratoga Harness Racing Assn. v Monaghan, 9 Misc 2d 868; Matter of Atlas Lathing Corp. v Bennett, 176 Misc 959 [none of which involved a Grand Jury subpoena].)” (Matter of Heisler v Hynes, 42 NY2d 250, 258.)