NEW YORK STATE COMMISSION ON GOVERNMENT INTEGRITY, Petitioner, v ROBERT J. CONGEL et al., Respondents.

Supreme Court, New York County, November 15, 1988

**APPEARANCES OF COUNSEL**

*James M. McGuire* and *Simpson, Thacher & Bartlett (Brad Friedman* of counsel), for petitioner. *Dewey, Ballantine, Bushby, Palmer & Wood (Sanford M. Litvack* of counsel), for respondents.

OPINION OF THE COURT

KRISTIN BOOTH GLEN, J.

Petitioner New York State Commission on Government Integrity (the Commission) moves for an order pursuant to CPLR 2308 (b) compelling compliance by a date certain with three subpoenas duces tecum and three subpoenas ad testificandum previously served upon respondents. This motion requires consideration of the general rules applicable to administrative subpoenas as well as constitutional claims under the First, Fourth (subpoenas duces tecum) and Fifth (subpoenas ad testificandum) Amendments as they arise in the context of this case.

In order to understand and evaluate these quite distinct claims, it is necessary to review the history of, and legal basis for, the Commission as well as the facts of the particular investigation involved here. Respondent's nonconstitutional arguments may then be disposed of and, finally, the constitutional issues resolved.

FACTS

*The Commission*

The Commission was created by Governor Cuomo on April 21, 1987 pursuant to Executive Order No. 88.1 (9 NYCRR 4.88) to "[i]nvestigate weaknesses in existing laws, regulations and procedures relating to campaign contributions and campaign expenditures, and determine whether such weaknesses create an undue potential for corruption, favoritism, undue influence or abuse of official position or otherwise impair public confidence in the integrity of government." (Executive Order No. 88.1, para [II] [5].) To effectuate this mandate, the Commission was granted limited investigative powers to subpoena witnesses, books and records, as provided by section 63 (8) of the Executive Law. (Executive Order No. 88.1, para [IV].)

The Commission's power was limited, however, by specifically directing compliance with Civil Rights Law § 73. (Executive Order No. 88.1, para [VI].) Further, the Commission was directed to promptly communicate any evidence of the violation of existing law to the appropriate law enforcement authorities and to fully cooperate with prosecutorial agencies to avoid jeopardizing ongoing investigations and prosecutors. (Executive Order No. 88.1, para [VII].) The Commission was given no independent prosecutorial power.

*The Election Investigation*

In July 1987, the Commission commenced an extensive investigation into the campaign financing practices in the 1985 Town Board elections in Poughkeepsie (the elections). The investigation allegedly had two goals: (1) to determine whether weaknesses and loopholes in the election laws, as illustrated by the elections, created "an undue potential for corruption, favoritism, influence or abuse of official position or otherwise impair[ed] public confidence in the integrity of government", and (2) review the operations of the New York State Board of Elections and its investigation into earlier allegations of wrongdoing arising out of the elections to determine whether the Board adequately monitored compliance with the Election Law and, if not, whether the Board's ineffectiveness "impair[ed] public confidence in the integrity of government."

Once commenced, the Commission's Poughkeepsie investigation focused upon the role of the Pyramid companies, a Syracuse-based real estate development group (Pyramid), several Republican Party committees and a political action committee. Respondents Congel, Ungerer and Kenan are each partners in Pyramid or related entities.

To date, the investigation has already revealed that early in 1985, Pyramid established the Poughkeepsie Galleria Company (PGC), a partnership, to build a mall in Poughkeepsie; respondents Ungerer and Kenan were partners in PGC. At that time, there were not enough members of the Poughkeepsie Town Board in favor of the mall project to ensure approval of a required zoning change. Accordingly, a campaign strategist was hired to manage campaign efforts on behalf of selected candidates who were or might be in favor of the mall, apparently without the knowledge or consent of the candidates supported and without any mention that the mall was the underlying issue.

Pyramid and others affiliated with it then funneled several hundred thousand dollars into the campaigns of these candidates through several political committees, e.g., the Building a Better New York Committee (BBNY), the New York Republic State Committee (RSC) and the New York Republican Federal Committee (the Federal Committee); many of these contributions were not reported as required by the Election Law. Each of these committees, in turn, spent substantial sums in connection with the Poughkeepsie elections. Hundreds of thousands of dollars were also disbursed by various Pyramid

companies to at least three vendors that provided election-related services.

Under present law, contributions made to "housekeeping accounts" of constituted committees, such as the RSC, or party committees, such as the Federal Committee, for the purpose of maintaining a permanent headquarters and staff, are limited only by the $150,000 annual limitation in contributions per individual (Election Law § 14-114 [1], [4]; § 14-124 [3]); money donated to such housekeeping accounts may not legally be utilized for the express purpose of promoting specific candidates. (Election Law § 14-124 [3].) Similarly, contributions made to a committee that is not authorized by the candidate that it supports, such as BBNY, are not limited. (See, Election Law § 14-100 [9] [3].)

Petitioner's investigation revealed that a large percentage of Pyramid's contributions, if made directly to the candidates and properly reported, would have been severely limited by the Election Law. A number of contributions, including in-kind contributions, were not disclosed as required by the law. The Board of Elections reviewed these matters and determined that although the law had been violated, the violations did not warrant criminal prosecution.

On December 21, 1987, after accumulating this data, the Commission released a report to the Governor and to the press setting forth what it characterized as its "preliminary conclusions." Although this report encompassed what appeared to be extensive and detailed data with regard to the elections, the Commission contends that its investigative duties are far from finished and that it must answer many additional questions before it may reach its final conclusion. Among these questions are:

1. Did respondents intend that the contributions which they made to the "housekeeping accounts" of the Republic Party be passed through to the Poughkeepsie campaign?

2. Did the Pyramid companies reimburse any of the individuals affiliated with them who made these campaign contributions?

3. Are there internal memoranda or other documents which reflect or shed light on any understandings which influenced these contributions?

4. Who, in the Pyramid organization, solicited or arranged for these contributions?

5. Are there any documents which help explain why one of

the political committees, Building a Better New York, devoted virtually all its resources to Poughkeepsie candidates?

6. What were the purposes of Pyramid's own company payments to Thomas Spargo[1] and to the campaign strategist who organized the Poughkeepsie campaign?

7. What role did the Pyramid principals play in the campaign, including decisions as to which candidates to support?

8. What was the total amount contributed by Pyramid and its affiliates and/or employees?

9. Were the expenditures made by the Building a Better New York Committee to vendors of election campaigns made independently of the candidates?

10. Were postelection contributions promised?

It is the Commission's position that it must obtain the information subpoenaed from respondents, as well as their testimony, to resolve the fundamental issue remaining open, i.e., whether the funneling of these vast sums of money was the product of a sophisticated and well-financed effort to take advantage of loopholes in the Election Law, structured on the advice of counsel in an effort to comply with the law, or whether it was a concerted and concealed effort also to violate the law with some degree of confidence that the violations would be undetected or overlooked. The "knowledge, intent and understanding" of respondents is alleged to be critical to this determination.

ARGUMENT

## Nonconstitutional Grounds

Respondents oppose enforcement of the subpoenas on several nonconstitutional grounds including

1. that they serve no legitimate purpose and are instead intended to harass;

2. that because of press leaks they violate Civil Rights Law § 73 (8); and

3. that they are overly broad.

THE LAW

## General Principles

The general standard for determining the validity of a

---

1. Thomas Spargo served as counsel to the RSC, treasurer of the Federal Committee, secretary and founder of BBNY and counsel to Pyramid.

nonjudicial "office" subpoena is well established. An agency of the government may conduct an inquiry into the affairs of those within its jurisdiction only if it can establish "(1) its authority for engaging in such an investigation and issuing the subpoena; (2) that the evidence sought is reasonably related to the subject of inquiry; and (3) that there is an authentic factual basis to warrant the particular investigation". *(Matter of National Freelancers v State Tax Commn., 126 AD2d 218, 220 [3d Dept 1987], citing Matter of Levin v Murawski, 59 NY2d 35 [1983]; Matter of A'Hearn v Committee on Unlawful Practice of Law, 23 NY2d 916 [1969].)*

When a subpoena is issued after extensive examination of witnesses and documents, as is the case here, it is incumbent upon the issuer to establish clearly the reasonable relationship, or at least establish such basis that it may reasonably be concluded that the efforts would or reasonably might be fruitful, were the subpoena to be enforced. *(Matter of Horn Constr. Co. v Fraiman, 34 AD2d 131, 133 [1st Dept 1970], affd 29 NY2d 559 [1971].)* Respondents' first and second objections to the subpoenas served upon them must be analyzed in accordance with these general principles.

*Harassment*

As a threshold issue, respondents do not, and indeed could not, argue that the Commission lacks the authority to issue subpoenas. The Executive Order creating the Commission unequivocally conferred upon it the power to compel witnesses to testify and to produce books and records. (Executive Order No. 88.1, para [IV]; *see generally,* State-City Commn on Integrity in Govt, Mar. 11, 1986-Dec. 18, 1986, I Reports and Recommendations, Final Report, at 21.) Rather, they argue that the material sought by the Commission is not reasonably related to the Commission's mandate to investigate weaknesses in the laws relating to campaign contributions and in the existing enforcement machinery, and is instead relevant only to a determination of whether they have committed any violation of the Election Law. They conclude that since the subpoenas served no purpose but to violate their rights and to harass them, the subpoenas must be quashed.

In so arguing, respondents first contend that since the subpoenas call for information that respondents have already voluntarily caused to be produced or that petitioner knows that it has no legitimate interest in obtaining, and since petitioner has repeatedly leaked this information to the press

in violation of Civil Rights Law § 73 (8), the subpoenas are primarily designed to harass and must therefore be quashed. This contention is without merit. Respondents clearly have not supplied the Commission with all of the information demanded by the subpoenas. They also offer no factual basis that the subpoenas were not issued in good faith, but rather for the purpose of harassing respondents or gathering information to be used to their personal detriment.[2]

*Violation of the Civil Rights Law*

The argument that the subpoenas must be quashed on the ground that many of the details of this investigation were released to the press in violation of Civil Rights Law § 73 (8) is equally unavailing. That section provides that no testimony or other evidence adduced at an investigative hearing, conference or interview shall be disseminated or made available to the public by the agency, its counsel or employees without the express approval of the head of the agency.

Although alleging violations of this provision, respondents offer no proof that the alleged offending media reports appeared as the result of an unlawful release of information by petitioner. Petitioner adamantly maintains that no unauthorized release occurred, and if it did, the information released is argued to be inconsequential. The court need not resolve this factual dispute, however, since respondents offer no basis upon which to conclude that, even assuming a violation of section 73 (8), the proper remedy would be to quash the subpoenas issued during the course of the investigation. The statute contains no such remedy, rather stating that any violation of the provision is punishable as a misdemeanor.

*Overbreadth*

Respondents are correct in characterizing the subpoenas as unduly burdensome and overbroad. In addition to demanding the production of all information in respondents' possession regarding the Poughkeepsie election and their contacts with

---

2. The conclusion that the subpoenas were not issued for the purpose of personally harassing respondents is supported by the fact that the Commission has served similar subpoenas upon numerous Republican Party and Democratic Party committees and committee members in its attempt to carry out a comprehensive investigation. *(See, New York Republican State Comm. v New York State Commn. on Govt. Integrity,* 138 Misc 2d 790 [Sup Ct, NY County 1988], *affd* 140 AD2d 1014 [1st Dept 1988]; *Lurie v New York State Commn. on Govt. Integrity,* index No. 1157/88, Sup Ct, NY County, Shackman, J.)

known persons involved in the election, the subpoenas demand the production of all records concerning the organization, formation and ownership of PGC, along with all of its corporate records. This demand is clearly beyond the scope of the Commission's investigation into weaknesses in the Election Law and its enforcement machinery.

The judicial remedy for an attack upon an overly broad subpoena, however, is not to quash the subpoena in its entirety, but to modify it so that the materials demanded are reasonably within the agency's subpoena power. *(Matter of New York State Commn. on Judicial Conduct v Doe,* 61 NY2d 56 [1984]; *Matter of Carvel Corp. v Lefkowitz,* 77 AD2d 872 [2d Dept 1980], *lv denied* 55 NY2d 602 [1981].) Respondents rejected petitioner's oral offer to narrow the scope of the subpoena and took the position that petitioner is not entitled to any of the subpoenaed material or to their testimony concerning the material. Accordingly, no further discussion of the issue of overbreadth is necessary or appropriate until it is determined that petitioner is constitutionally entitled to some portion of the subpoenaed materials or testimony.

### THE FOURTH AMENDMENT

Although most cases involving office subpoenas neither mention the Fourth Amendment nor contain any discussion of constitutional limitations on such subpoenas, under certain circumstances the Fourth Amendment clearly applies. *(See, Matter of Harlem Teams for Self-Help v Department of Investigation,* 122 Misc 2d 1066 [Sup Ct, NY County 1984].) The absence of any Fourth Amendment consideration in reported decisions is a result both of historical factors and the failure to place governmental intrusions on privacy on a spectrum by their factual components rather than by the labels placed on them. This analysis, more fully set forth in *Harlem Teams (supra),* will be summarized briefly before being applied to this motion.

### Analysis

The Fourth Amendment protects citizens from unreasonable searches and seizures; except in carefully defined circumstances[3] any search or seizure without a warrant based on

---

**3.** These include the so-called automobile exception *(United States v Ross,* 456 US 798 [1982]; *People v Langen,* 60 NY2d 170 [1983]); the "grab area" around an arrested person *(Chimel v California,* 395 US 752 [1969];

probable cause is unreasonable and thus unconstitutional. *(See, e.g., Matter of B. T. Prods. v Barr,* 44 NY2d 226 [1978].)

Searches—that is, the looking or listening by the State in areas where individuals have some expectation of privacy[4] *(see, e.g., Katz v United States,* 389 US 347 [1967])—may, however, be "reasonable" even without a warrant where their purpose is an administrative, noncriminal, routine inspection. *(See, e.g., Marshall v Barlow's, Inc.,* 436 US 307 [1978]; *Camara v Municipal Ct.,* 387 US 523 [1967]; *Sokolov v Village of Freeport,* 52 NY2d 341 [1981].) But once the purpose of the search moves from administrative compliance to a quest for evidence to be used in a criminal prosecution, the State may only enter to make the search if it has a warrant based on probable cause. *(Michigan v Tyler,* 436 US 499, 508 [1978].)

There is a similar distinction in the seizure requirements of the Fourth Amendment when the government obtains information—through records, documents and other "things" produced in response to subpoenas duces tecum—for investigatory and/or administrative purposes, and when it seeks to retain such information (documents) for use in a criminal prosecution.

In the former case, which can be visualized as a witness bringing in, discussing and leaving with documents which may be of interest to an investigatory, but nonprosecutorial body, the appearance with documents is not considered a "seizure" and therefore not thought of as subject to constitutional protection under the Fourth Amendment.[5] Yet the courts recognize, as in the administrative search area, that the

---

*People v Smith,* 59 NY2d 454 [1983]); objects in plain view *(e.g., Texas v Brown,* 460 US 730 [1983]); searches incident to lawful arrest *(Rawlings v Kentucky,* 448 US 98 [1980]; *People v Landy,* 59 NY2d 369 [1983]). None of the exceptions is relevant to a discussion of subpoenas duces tecum.

4. Because questioning in front of a Grand Jury or other investigative body does not take place in the home, or other area where the witness has any expectation of privacy, the summoning of such witness does not, historically or conceptionally, constitute a "search" for Fourth Amendment purposes.

5. As to the distinction between looking at documents and retaining (or "seizing" them), see *Matter of Heisler v Hynes* (42 NY2d 250, *rearg denied* 42 NY2d 1015 [1977]) and *Matter of Windsor Park Nursing Home v Hynes* (42 NY2d 243, *rearg denied* 42 NY2d 1015 [1977]) where the Court of Appeals held that neither a Grand Jury *(Matter of Heisler v Hynes)* nor office subpoena *(Windsor Park Nursing Home v Hynes)* could be used to compel a witness to surrender *possession* of records or other property for retention and independent inspection. The court found that authorization for the power to retain and inspect must, "if [it] be constitutionally valid" come

intrusion on the citizen, witness's privacy and "papers" cannot be entirely arbitrary; the subpoenaing body must show, as discussed above, its legitimate purpose as well as the materiality and relevancy of the papers sought. *(See, e.g., Matter of A'Hearn v Committee on Unlawful Practice of Law*, 23 NY2d 916, *supra.)* Understood as one end of a Fourth Amendment continuum *(see, Matter of Harlem Teams for Self-Help v Department of Investigation, supra,* at 1073-1077), these general requirements for administrative subpoenas duces tecum can be seen as defining "reasonable" based on a lesser showing than probable cause since the context is investigatory rather than accusatory or criminal.

The Court of Appeals has written: "a search warrant, unlike [a] subpoena, is not a preliminary investigatory tool, but is rather a device for obtaining evidence intended to be used against a defendant where probative support of his guilt is already known to the authorities. Clearly, the concerns which require that constitutional protections attach when a warrant issues do not apply equally when an investigatory subpoena duces tecum is served." *(Matter of Hynes v Moskowitz,* 44 NY2d 383, 394-395 [1978].)[6]

Where, however, the purpose of obtaining records is not preliminary and investigatory, but closer to actual criminal prosecution, constitutional requirements for production and seizure[7] increase, regardless of the term by which the legal device employed is denominated (e.g., "subpoena or warrant").

Consistent with the Fourth Amendment analysis made in analogous search cases, this might be understood as requiring the State to show a far higher degree of materiality and

from the Legislature. (42 NY2d, at 254.) The Legislature immediately responded with an integrated package involving CPLR 2305; Penal Law § 215.70; Executive Law § 63 (8); CPL 190.25 and 610.25. *(See,* Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 610.25, at 269.)

6. That case *(Matter of Hynes v Moskowitz,* 44 NY2d 383, 394) upheld the facial constitutionality of the legislation referred to at footnote 5 *(supra)* against a claim that "the challenged statutes are violative of the Fourth Amendment * * * in authorizing the seizure and retention of subpoenaed materials without a showing of probable cause."

7. The "seizure" occurs when the State (whether commission, Grand Jury or police officer) retains the documents for possible *later* use in a criminal proceeding. With modern technology, this may now be done by xeroxing or other duplicating techniques, so that, unlike the 18th century, documents can simultaneously be "seized", kept *and* returned to their owners.

relevancy when there is the possibility or likelihood of use of the subpoenaed materials as evidence in a criminal proceeding. *(See, Matter of Harlem Teams for Self-Help v Department of Investigation,* 122 Misc 2d 1066, 1076-1077, *supra;*[8] *cf., Matter of Temporary State Commn. on Living Costs v Bergman,* 80 Misc 2d 448 [Sup Ct, NY County 1975].)[9] Although probable cause itself may not be required *(cf., Matter of Grand Jury Subpoenas,* 72 NY2d 307, 315 [1988]),[10] the Commission's showing here falls far short of the high degree of materiality and relevancy necessary where the investigation is very far along, and a criminal proceeding against the subpoenaed witnesses is a strong possibility.[11]

---

**8.** "Put another way, the requirements of relevancy and materiality are themselves instantiations of the Fourth Amendment's reasonableness test which are more or less strictly applied depending upon where in the spectrum of intrusion the governmental demand is located. The greater the intrusion [and the less "preliminary" and "investigatory" the purpose of the subpoena], the higher [the] degree of relevancy and materiality must be shown". *(Matter of Harlem Teams for Self-Help v Department of Investigation,* 122 Misc 2d 1066, 1074.)

**9.** In *Matter of Temporary State Commn. on Living Costs v Bergman* (80 Misc 2d 448) there was evidence that the Commissioner had improperly disseminated information from hearings which were in progress, and had indicated that he was seeking to make a criminal case against the subpoenaed witnesses. The court held that where the relevance of the materials sought was "in preparation or in aid of a criminal prosecution, not within the purview of [the agency's] jurisdictional powers, the subpoena will be quashed." *(Supra,* at 453, citing *In re Grand Jury Proceedings,* 486 F2d 85 [3d Cir 1973]; *Branzburg v Hayes,* 408 US 665 [1972]; *Boren v Tucker,* 239 F2d 767, 772 [9th Cir 1956].)

**10.** In that case *(Matter of Grand Jury Subpoenas,* 72 NY2d 307) the Court of Appeals upheld Grand Jury subpoenas duces tecum for the names, addresses and Social Security numbers of all members of four union locals against a claim that "the subpoenas [were] so broadly drafted that they violate the Fourth Amendment's prohibition against unreasonable searches and seizures". *(Supra,* at 315.) Citing *Matter of Hynes v Moskowitz* (44 NY2d 383), the court wrote that "a subpoena duces tecum, unlike a search warrant, does not have to be supported by probable cause". *(Supra,* at 315.) Because the Fourth Amendment challenge there was to overbreadth, and because the materials sought were for investigatory purposes, and not as evidence which might prove guilt in a criminal proceeding, the court's reasoning is not inconsistent with the analysis offered here.

**11.** The Commission's preliminary report indicates that it has found evidence of criminal violations in its investigation of the Poughkeepsie election and it is, by the order creating it, *required* to turn that evidence over to appropriate law enforcement authorities. As in *Temporary State Commn. on Living Costs v Bergman* (80 Misc 2d 448), the press has quoted at least one member of the Commission as stating that it "may refer the case to federal or state prosecutors to investigate possible racketeering, mail fraud or election law violations". (Lynn, *Panel Criticizes Elections Board on Ethics Case,* NY Times, Oct. 26, 1988, at B4, col 1.)

*Application*

In seeking to establish its need for the material subpoenaed from respondents and hence sustain their burden of establishing the reasonableness of their demands, petitioner urges that it cannot carry out its legislative mandate of evaluating the Election Law and recommending amendments unless it is permitted to obtain answers to a series of questions that it believes are essential to a thorough investigation. A number of those questions and the facts they seek to establish are set forth *supra,* at pages 12 through 13.

On close examination, none of the Commission's questions can be seen as highly relevant and/or material to petitioner's inquiry.[12] Respondents' knowledge and intent with regard to earmarking and the use of "housekeeping funds" (the first questions, *supra,* at 12) does nothing to illuminate whether the Commission should recommend that the Election Law be amended to proscribe earmarking, which is now permissible. *(See,* Election Law § 14-114 [1], [4].) Since the Commission has ascertained that postelection contributions that do not fall within the Election Law's disclosure rules were made, whether such contributions were promised has no bearing on whether additional disclosure requirements are needed in this area (the tenth question).

Given the Commission's knowledge that the total contributions made by Pyramid and its affiliates far exceed the limits recommended in the Commission's preliminary report, the amount actually contributed is not significant (the eighth question, *supra,* at 13). Further, since the Commission is fully aware of the various "hats" worn by Thomas Spargo, it is certainly possessed of adequate facts to recommend a limitation of the number of roles that may be played in a campaign by a single individual without delving into the specifics of the attorney-client relationship between respondents and Spargo (the sixth question, *supra,* at 13).

---

12. In the courtroom, materiality is determined by the relation between the propositions for which evidence is offered and the issues in the case as defined by the pleadings. Relevancy is the tendency of the evidence to establish a material proposition *(e.g.,* McCormick, Evidence §§ 184-185, at 433-434 [2d ed]). Here, materiality, and secondarily only relevancy must be determined by consideration of the purposes for which the Commission was created (Executive Order No. 88.1, para [II] [5]).

Finally and most important, any further investigation into the first, second, third, fourth and seventh questions *(supra,* at 12, 13) must at this stage of the investigation be construed as seeking to uncover criminal violations of the Election Law. Such information is clearly not material to the purposes of the Commission.[13]

Although the Commission's investigation may have begun as general and nonaccusatory, it is now at a point where much of the information sought to be obtained by the subpoenas duces tecum may be evidence of criminal violations of the election or other laws, and may be turned over to State and/ or Federal prosecutors for criminal proceedings. Since the Commission has not shown, and, at this point in the investigation cannot show that the material subpoenaed is highly relevant and material to its properly authorized investigation, the subpoenas duces tecum must be quashed.

*Fifth Amendment*

In the same way that the Fourth Amendment may impose constitutional restrictions on seizures resulting from subpoenas duces tecum, the Fifth Amendment may protect subpoenaed witnesses against constitutionally prohibited self-incrimination. Respondents have indicated that they will be asserting their Fifth Amendment privilege if their other challenges to the subpoenas ad testificandum are rejected. Since, as discussed below, their final, First Amendment argument is generally unavailing, the proper procedure involves their appearance at the Commission's deposition and assertion of the

---

**13.** This is not to say, as the Commission seems to argue against, that an administrative, noncriminal body may not carry out both civil and potentially prosecutorial investigation. *(See, e.g., United States v LaSalle Natl. Bank,* 437 US 298 [1978].)* The relief sought here is not an injunction against the investigation, or a finding that no subpoenas may be issued because of the twofold nature of the investigation *(see, Matter of Sigety v Hynes,* 38 NY2d 260 [1975]).* "Although the Attorney-General has often served the dual function of investigating and prosecuting, this court has never held, nor should it now hold, that his authority to issue subpoenas to investigate alleged violations of law is impaired by his obligation to prosecute such violations." (38 NY2d, at 267.) In fact, as discussed *infra,* the subpoenas ad testificandum will be enforced, subject to the Fifth Amendment, regardless of the possibility of a subsequent prosecution. It is rather the degree of materiality and relevance required when the investigation has moved toward uncovering and reporting criminal violations which must be considered as to *particular* subpoenas duces tecum under the Fourth Amendment.

privilege only as to those questions where there is a possibility of self-incrimination.[14]

*First Amendment*

Respondents argue that the subpoenas must be quashed on the ground that they call for information that intrudes upon their First Amendment rights. They contend that the subpoenas constitute a blunderbuss inquiry into their participation in an election campaign, and that allowing such an inquiry would have a chilling effect on their constitutional right to free association. However, they advance no specific claims of *how* the subpoenas ad testificandum would chill their protected associational rights.

In circumstances which implicate First Amendment concerns, the usual deference given to administrative investigations is not appropriate, and protection of the constitutional liberties of the target of the subpoena calls for a more exacting scrutiny of the justification offered by the agency. *(E.g., Federal Election Commn. v Larouche Campaign,* 817 F2d 233, 234-235 [2d Cir 1987], citing *Federal Election Commn. v Machinists Non-Partisan Political League,* 655 F2d 380, 386-388 [DC Cir 1981], *cert denied* 454 US 897 [1981].)

"It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *(N. A. A. C. P. v Alabama,* 357 US 449, 460 [1958], citing *Gitlow v New York,* 268 US 652, 666 [1925]; *Palko v Connecticut,* 302 US 319, 324 [1937]; *Cantwell v Connecticut,* 310 US 296, 303 [1940]; *Staub v City of Baxley,* 355 US 313, 321 [1958].) Thus, in order to avoid a "chilling effect" on associational rights, there must be a "substantial relation" between the government interest sought to be advanced or protected by the administrative inquiry and the information required to be disclosed by the subject subpoena. *(Marshall v Stevens People & Friends for Freedom,* 669 F2d 171, 177-178 [4th Cir 1981], citing *Buckley v Valeo,* 424 US 1 [1976].)

The fact that the administrative inquiry involved here concerns contributions to political campaigns does not, how-

---

14. The Commission has agreed that both the Fifth and First Amendment (discussed below) objections to particular questions may be made on the record by respondents, and that such record may be submitted for subsequent judicial review if the Commission deems it necessary and appropriate.

ever, standing alone, compel the conclusion that the subpoenas must be quashed. Inquiry into political contributions has been upheld where such inquiry was found to be necessary to investigate a complaint alleging misconduct on the part of a Judge. *(Matter of Nicholson v State Commn. on Judicial Conduct,* 50 NY2d 597 [1980].) Inquiry has also been permitted into the names of political contributors as part of an investigation by the Federal Election Commission into the campaign conduct of a presidential candidate and his alleged noncompliance with the Federal election laws. *(Federal Election Commn. v Larouche Campaign,* 817 F2d 233, *supra.)*

The issue raised by recent State and Federal cases is the allocation of burdens between the party seeking to quash a subpoena on First Amendment grounds and the State which seeks enforcement. While assertion of First Amendment claims may trigger more careful scrutiny, the *Larouche* court held that the party challenging the subpoena must make a showing similar to that made in *N. A. A. C. P. v Alabama* (357 US 449, *supra)* that disclosure of those associated with it was likely to result in reprisals, harassment or threats, before heightened scrutiny of the State's need would be required.

In a recent decision by our Court of Appeals upholding subpoenas of a union's membership list, the majority found that the "petitioners [had] not demonstrated that organizational activity would be curtailed because of the delivery of the lists." *(Matter of Grand Jury Subpoenas, supra,* 72 NY2d, at 314.)[15] Judge Titone, dissenting for himself and Judges Alexander and Bellacosa, pointed out that, by its decision, the majority had shifted the burden to petitioners, rather than following older cases where "[o]nce it was shown that First Amendment rights were implicated * * * the burden shift[ed] to the government to show that there was a compelling State interest." *(Supra,* at 320 [Titone, J., dissenting opn].)[16]

This court is bound by the majority in *Matter of Grand Jury*

15. The majority reasoned that "[b]ecause of the [economic] advantages of union membership and the need to disclose it for employment it is not generally concealed or denied." *(Matter of Grand Jury Subpoenas,* 72 NY2d 307, 314.)

16. The compelling interest test, according to the dissent and cases where there cited, requires not only a showing as to the government's interest in the subject investigated—there, corruption in the carpentry and drywall industry—but also to its need for the specific information sought. On that basis, that is that the disclosure of the entire list was excessive, that the information was elsewhere obtainable, etc. The dissenters would have quashed the subpoenas.

*Subpoenas (supra).* Accordingly, since respondents have failed to demonstrate with any particularity the way in which their associational rights and/or protected organizational activity are threatened by the subpoenas ad testificandum, those subpoenas may not be quashed. Respondents may, however, upon appearance for their deposition, assert First Amendment objections to any questions as to which they can make a particularized showing in accordance with the procedure discussed in footnote 14 *(supra).*

CONCLUSION

There is no question that the Commission's investigation is of great importance to our State, our citizenry, and the democratic process by which our government is chosen. It is equally important that such investigation be carried out with respect and sensitivity to the constitutional rights of those involved.

By its own admission, both here and in the press, the Commission is at an advanced stage in its investigation of problems with the existing Election Law and the New York State Board of Elections. The material sought from respondents goes, in large part, to their knowledge, understanding and intent to circumvent, evade, or violate the Election Law in the Poughkeepsie elections.

Because the Commission has information sufficient to allow it to make recommendations, because it is required to turn over information of criminal activity (of which "intent" is, of course, a key factor) to appropriate prosecutorial agencies, and because it has indicated a strong possibility that it is about to do so, the Fourth Amendment requires a very high degree of materiality and relevance before the subpoenas duces tecum can be enforced. On this record the Commission has failed to make that showing.

Similarly, although they assert the protection of the First Amendment because the Commission's inquiry involves the political, electoral arena, respondents have failed to sustain their burden of demonstrating any actual infringement of, or burden upon their legitimate, constitutionally protected associational rights. Accordingly, the subpoenas ad testificandum will be enforced. Respondents may assert First and/or Fifth Amendment objections to specific questions based on a good-faith, factual basis which may be subject to judicial review.

Settle order including dates certain for compliance.