The PLAYERS, INC., d/b/a
The Players, Plaintiff,

v.

CITY OF NEW YORK, Eliot Spitzer, In His Official Capacity as Attorney General of the State of New York and Antonia C. Novello, In Her Official Capacity as Commissioner of the New York State Department of Health, Defendants.

No. 03 CIV. 10155(VM).

United States District Court,
S.D. New York.

May 20, 2005.

See also 315 F.Supp.2d 461.

Kevin T. Mulhearn, Law Office Kevin T. Mulhearn, P.C., Orangeburg, NY, for Plaintiff.

Ave Maria Brennan, Corporation Counsel Office, City of New York, John P. Gasior, Eliot Spitzer, Attorney General of the State of New York, New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

This case raises a constitutional challenge to smoking restrictions recently adopted by the City of New York (the "City") and the State of New York (the "State") (collectively, "Defendants").[1] The State's new restrictions are contained in Chapter 13 of the Laws of 2003 ("Chapter 13"), and the City's new restrictions are contained in Local Law 47 of 2002 ("Local Law 47") (collectively, the "Smoking Bans"). The case was consolidated with an earlier action decided by this Court and reported as *NYC C.L.A.S.H., Inc. v. City of New York*, 315 F.Supp.2d 461 (S.D.N.Y. 2004) ("*CLASH*"), and is similar to that case in most respects. As in *CLASH*, the plaintiff here, The Players, Inc., d/b/a The Players ("Players"), is challenging the constitutionality of The Smoking Bans. Also as in *CLASH*, Defendants have moved to dismiss or, in the alternative, for summary judgment. Familiarity with the Court's description in *CLASH* of the statutory

1. While the nominal State defendants are Eliot Spitzer and Antonia C. Novello, they are being sued in their official capacities as officers of the State. Consequently, the Court will treat the State as the real party-in-interest.

schemes at issue, and its disposition of Defendants' motions, is assumed.[2]

This case differs from *CLASH* in three important respects, however. First, unlike the plaintiff in *CLASH*, Players is not an issue-oriented organization formed to advocate for smokers' rights. Rather, it is a private social club with a long and storied history. Players, according to the allegations in the Amended Complaint, was formed almost 100 years ago as a social club for actors and members of the theatrical profession. (*See* Amended Complaint, dated August 30, 2004 ("Am.Compl.") ¶¶ 7–8.) Second, Players' Amended Complaint raises new or slight variations on constitutional claims raised in *CLASH*: a new claim based on the Fourth Amendment's regulation of governmental searches and seizures, another variant of the claims under the Equal Protection Clause and First Amendment raised in *CLASH*, and a new claim based on the Due Process Clause of the Fourteenth Amendment. Third, the procedural posture of this case is different: while the *CLASH* plaintiffs opposed Defendants' motions and cross-moved for summary judgment, Players submitted a motion for further discovery pursuant to Fed.R.Civ.P. 56(f) and failed to submit any materials other than a belated memorandum of law in opposition to Defendants' motions in this case. Players' Rule 56(f) motion has sought to stay the Court's consideration of Defendants' motions while further discovery is conducted.

As discussed in greater detail below, the Court declines to delay its consideration of Defendants' motions. It denies Players' Rule 56(f) motion, and grants Defendants' motions for summary judgment.

## I. BACKGROUND

The Court must describe the convoluted procedural history of this case to explain why it is prepared to rule on Defendants' motions without further briefing from the parties. Players filed the instant suit on December 23, 2003, several months after CLASH filed its challenge to the State's and City's smoking laws. The Court consolidated the two cases on February 2, 2004, and informed the parties through their attorneys that it would delay its consideration of Players' suit until it first disposed of the claims in *CLASH*. The Court did so not only because of the similarity of issues raised by the two cases, but also because counsel for the parties were the same in both cases: Kevin T. Mulhearn, Esq. ("Mulhearn") represents both the *CLASH* plaintiffs and Players, and John P. Gasior ("Gasior") and Ave Maria Brennan ("Brennan") represent the State and City, respectively, in both cases. The Court's opinion in *CLASH*, which granted the State and City summary judgment on all claims, was issued on April 21, 2004.

On April 29, 2004, Mulhearn faxed a letter to the Court indicating that he had decided to amend Players' Complaint to narrow its claims against Defendants in response to the Court's *CLASH* decision. He informed the Court at that time that the Amended Complaint "should be ready early next week." (*See* Letter from Kevin T. Mulhearn to the Court of 4/29/04.) In fact, the promised Amended Complaint was not filed until September 15, 2004, more than four months after Mulhearn had informed the Court that it would be ready. Nonetheless, Defendants consented to the late service and filing of the Amended Complaint, and the Court authorized it to be filed.

**2.** The Court's description of The Smoking Bans can be found in *CLASH,* 315 F.Supp.2d at 466–67.

On September 23, 2004, the Court held a status conference to discuss scheduling and discovery issues related to the case. As Brennan recounts in a declaration submitted in response to Players' Rule 56(f) motion, at that conference, Mulhearn sought to propound limited discovery demands related to Players' Fourth Amendment and Equal Protection challenges to the laws. Defendants resisted, arguing that the case presented purely legal issues that did not require discovery, and that the case was therefore ripe for adjudication on the merits. The Court agreed to allow Mulhearn to serve limited discovery demands on Defendants by September 30, 2004. The parties informed the Court that the case would be ripe for adjudication on the merits following completion of the limited discovery sought by Mulhearn on Players' behalf. Consequently, the Court directed the parties to develop a briefing schedule for dispositive motions related to the case. (*See* Declaration of Ave Maria Brennan in Opposition to Plaintiff's Cross–Motion Pursuant to Rule 56(f) ("Brennan Opp. Decl.") ¶¶ 14–16.)

September 30, 2004, came and went without any submission of discovery demands by Mulhearn. Instead, by stipulation dated September 30, 2004, the parties agreed to the following briefing schedule: Defendants' motions to dismiss and/or for summary judgment were to be submitted by November 5, 2004; Players was to "serve its oppositions to the defendants' motions and serve its cross-motions" by November 26, 2004; Defendants were to "serve their replies on their motions and serve their oppositions to plaintiff's cross-motions" by December 17, 2004; and Players was to "serve its replies on its cross-motions" by December 31, 2004. (*See* Stipulation dated September 30, 2004 ("Stip.") ¶ 1.) Mulhearn, Brennan, and Gasior each signed the stipulation and jointly submitted it to the Court. The Court "So Ordered" the stipulation on October 3, 2004.

On November 4, 2004, the State submitted its motions to dismiss and, in the alternative, for summary judgment, along with supporting documentation. The City filed its motions to dismiss and/or for summary judgment on November 8, 2004. By that date, Mulhearn still had not propounded any discovery demands. Nor did Mulhearn submit Players' replies to Defendants' motions or any cross-motions on November 26, 2004, the date stipulated by the parties. Instead, by letter dated December 17, 2004, Mulhearn informed the Court that he had experienced health problems which had prevented him from submitting his opposition papers or seeking permission from the Court to modify the stipulated scheduling order. He requested an additional extension, until December 28, 2004, to submit Players' "opposition papers." (*See* Letter from Mulhearn to the Court of 12/17/04.) The Court granted Mulhearn's request, allowing him to submit his response on December 28, 2004, and providing Defendants until February 11, 2005, to submit their reply and opposition papers.

On December 28, 2004, Mulhearn submitted no opposition to Defendants' motions to dismiss. Nor did he submit any substantive response to Defendants' motions in the alternative for summary judgment. He also did not submit any cross-motions for summary judgment, as he had done in *CLASH* and as he indicated he would do at the September 23, 2004 status conference. Rather, he submitted a "Notice of Cross–Motion" indicating that he was seeking "an order and judgment, pursuant to Federal Rule of Civil Procedure 56(f), granting Plaintiff's application for additional discovery with respect to the issue of the New York City and/or New

York State regulatory schemes, if any, with respect to the enforcement of Local Law 47 and Chapter 13, respectively." (Players' Notice of Cross–Motion, dated December 28, 2004, at 1.) Mulhearn also submitted his own affidavit and a list of document demands, but no memorandum of law, in support of Players' Rule 56(f) motion.

On February 11 and 14, the State and City, respectively, submitted papers in opposition to Players' Rule 56(f) motion and in further support of their earlier motions. By letter dated February 17, 2005, Mulhearn requested until February 28, 2005 "to file and serve its reply papers." That letter further noted that Defendants' reply briefs contained additional arguments in support of their motions, and asked the Court: "Does the Court require Plaintiff to respond to the substantive motion points made by Defendants, even though Plaintiff has requested a continuance pursuant to its cross-motion. [sic] If so, kindly advise as to when such a response needs to be filed and served." (Letter from Mulhearn to the Court of 2/17/05.) The Court replied via memo endorsement granting Mulhearn until February 28, 2005 to submit reply papers, and stating the following in response to Mulhearn's question: "the Court is not clear what additional discovery Plaintiff refers to. It was the Court's impression that whatever discovery issues existed had been resolved. The parties are directed to confer and submit a stipulated briefing schedule for the remaining motion timetable." (*See* Order dated February 17, 2005 ("February 17 Order").) The Court faxed the memo endorsement to Mulhearn that day, and ordered Mulhearn to forward the memo endorsement to counsel for Defendants.

On February 28, 2005, Mulhearn submitted a single document to the Court: a reply memorandum of law in further support of its cross-motion for further discovery pursuant to Rule 56(f). Again, the document contained no substantive opposition to Defendants' motions, and no cross-motion for summary judgment in favor of Players. Also on February 28, the Court received a letter from Gasior stating that he had received a copy of the Court's February 17 Order only that morning, and attaching a letter from Mulhearn to Gasior stating the following: "Judge Marrero seems to indicate that we need to try to reach an agreement with respect to the remaining motion timetable. I thus propose that Plaintiff be permitted to serve and file opposition papers to your initial motions on or before March 13, 2005 and that Defendants be then permitted to serve and file reply papers on or before April 4, 2005." (Letter from Mulhearn to Gasior and Brennan of 2/28/05, attached to Letter from Gasior to the Court of 2/28/05.) Gasior's letter strenuously objected to Mulhearn's late notice of the Court's memo endorsement, as well as Mulhearn's proposal for an additional round of briefing. He argued that Mulhearn was not entitled to submit any additional papers in opposition to Defendants' motions, since he had already stipulated to a briefing schedule that gave him the opportunity to respond to Defendants' substantive motion points and raise whatever cross-motions he chose to raise.

The Court agreed with Gasior. By memo endorsement issued that day, the Court stated that it would not authorize further briefing on the various motions before it. (*See* Order dated February 28, 2005.) By letter dated March 1, 2005, Gasior submitted a follow-up letter to the Court indicating that he had consulted with Brennan and had concluded that the City and State had no further submissions in support of their motions or in opposition to Players' cross-motion. According to Gasior, "defendants believe that all the

parties' motions are fully briefed for the Court's consideration." (Letter from Gasior to the Court of 3/1/05.)

Though Mulhearn received copies of the Court's February 28 Order and was copied on Gasior's March 1 letter, he amended none of his papers and submitted no communications to the Court for more than three weeks. On March 23, 2005, Mulhearn wrote to the Court "to clarify an issue raised by the Court in its February 28, 2005 Order." According to Mulhearn, it was Players' position that his filing of the Rule 56(f) motion automatically stayed the Court's consideration of Defendants' summary judgment motion, and that the Rule gave him the opportunity to submit an additional brief opposing summary judgment even if the Court were to deny his motion for additional discovery. According to Mulhearn: "Such a conclusion is consistent with New York law, which provides that 'if [a] plaintiff believe[s] that he would be unable to respond to [a summary judgment] motion, Rule 56(f) provides non-moving parties with a *mechanism to stay the motion* while necessary discovery is conducted.'" (Letter from Mulhearn to the Court of 3/23/05) (quoting *Lawford v. New York Life Ins. Co.*, 739 F.Supp. 906, 917 n. 12 (S.D.N.Y.1990)) (bracketed text and emphasis in letter).

Both Brennan and Gasior took issue with Mulhearn's characterization of the Court's February 28 Order, the posture of the case, and the relevant law governing Rule 56(f) motions. By letter dated March 24, 2005, Brennan stated that Mulhearn had sought to create ambiguity in the February 28 Order where there was none: the Court had denied further briefing on the various motions before it. Brennan also argued that Mulhearn should not have the opportunity to present further briefing opposing Defendants' summary judgment motions because his "opportunity to oppose defendants' motions to dismiss or, in the alternative for summary judgment, was on December 28, 2004 when its opposition papers were due. The fact that plaintiff cross-moved on that date did not preclude plaintiff from including its opposition in these cross-motion papers. Plaintiff failed to do so." (Letter from Brennan to the Court of 3/24/05.) Brennan also noted that Mulhearn's letter was written almost a month after the order he sought to clarify was issued. Gasior, by letter dated March 25, 2005, concurred in full with the arguments raised in Brennan's letter. (*See* Letter from Gasior to the Court of 3/25/05.)

On April 28, 2005, the Court held a hearing ("April 28 Hearing") to receive oral argument on all of the motions pending before it. At that argument, the Court indicated that it was inclined to deny Players' Rule 56(f) motion. Mulhearn made brief arguments in favor of granting the Rule 56(f) motion, and in opposition to Defendants' motions. He asked for an additional opportunity to submit a supplemental brief opposing the merits of Defendants' motions, and promised that he could submit such a brief by no later than May 2, 2005. Over Defendants' objections, the Court granted this request.

Players submitted a document entitled "Supplemental Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint" ("Players Supplemental Mem.") to the Court on May 2. That document raised legal arguments in support of Players' claims, and argued that Defendants had "failed to demonstrate that there is no genuine triable issue of fact with respect to" Players' Fourth Amendment claim. (Players Supplemental Mem. at 6.) It did not submit any additional affidavits or other documents in opposition to Defendants' summary judgment motions.

## II. DISCUSSION

The Court first considers whether the Rule 56(f) motion made on behalf of Players has merit. Finding none, the Court then determines that the case is ripe for summary judgment on the basis of the pleadings and other submissions currently before it. Examining the merits of Defendants' motions, it concludes that summary judgment should be granted to Defendants on all of Players' claims.

## A. PLAYERS' RULE 56(F) MOTION

■ Rule 56(f) provides a vehicle for parties opposing a motion for summary judgment to obtain further discovery before the court rules on the motion.[3] It is settled in this Circuit that a motion for further discovery under Rule 56(f) may not be granted unless an affidavit is submitted by the moving party satisfactorily explaining the following: "[1] the nature of the uncompleted discovery; [2] how the facts sought are reasonably expected to create a genuine issue of material fact; [3] what efforts the affiant has made to obtain those facts; and [4] why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985) (establishing the four-part test). But even if the affidavit purports to satisfy all of these conditions, "Rule 56(f) is not a shield against all summary judgment motions.... [A] bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." *Paddington Partners*, 34

F.3d at 1138 (internal citations and quotation marks omitted).

■ Mulhearn's Rule 56(f) affidavit briefly enumerates the single issue on which Players seeks further discovery: Players' allegation that the Smoking Bans violate the Fourth Amendment. (*See* Affidavit of Kevin T. Mulhearn, dated December 24, 2004 ("Mulhearn Rule 56(f) Aff.") ¶¶ 2–3.) Mulhearn's affidavit asserts that Defendants, in their motion papers, deny that the Smoking Bans, or their regulatory schemes, authorize warrantless searches of commercial premises. (*Id.* ¶ 4.) He seeks discovery at this stage of the proceedings to prove the falsity of these alleged denials, and the unconstitutionality of the regulatory schemes that allegedly authorize warrantless searches of Players' premises. In support of his argument, Mulhearn states that Players has itself been subjected to a warrantless search for smoking-related paraphernalia. (*See id.* at ¶¶ 5–9.) Attached to the Rule 56(f) motion is a demand for production of documents seeking all materials related to "all regulatory schemes and/or administrative policies adopted and utilized with respect to the enforcement" of The Smoking Bans. (*See* Players' Demand for Production of Documents, dated December 28, 2004 ("Players Doc. Demand").)

Although Players' Rule 56(f) motion describes the nature of the discovery that allegedly remains incomplete, it fails to satisfy the remaining elements of the *Burlington* test. The second element of the test, which requires a movant to show "how the facts sought are reasonably expected to create a genuine issue of material fact," *Paddington Partners*, 34 F.3d at

3. Rule 56(f) states in full:
Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

1138, cannot be satisfied based on mere speculation that additional evidence may be found to support Players' case. *See id.* ("In a summary judgment context, an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion.") (quoting *Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991)); *Valley National Bank v. Greenwich Ins. Co.,* 254 F.Supp.2d 448, 463 (S.D.N.Y.2003) ("[A] court can reject a request for discovery [under Rule 56(f) ] if it deems the request to be based on speculation as to what potentially could be discovered.") (quoting *Seils v. Rochester School Dist.,* 192 F.Supp.2d 100, 116 (W.D.N.Y.2002)). Nor is a movant entitled to further discovery if the discovery sought is unlikely to produce evidence of a genuine issue of material fact that would defeat a summary judgment motion. *See Banque Nationale de Paris S.A. Dublin Branch v. Insurance Co. of North America,* 896 F.Supp. 163, 166 (S.D.N.Y.1995) ("As ... defendants have offered no reasonable basis from which to infer that discovery would produce evidence of the existence of a genuine issue of material fact that would defeat this summary judgment motion, the Court holds that there is no basis for Rule 56(f) relief.").

Players has failed to demonstrate that its belief in the existence of additional documents related to the Smoking Bans' regulatory schemes and administrative policies is *not* speculative. There is *no* indication that the documents Players seeks have not already been provided or are not matters of law that are inappropri-

ate subjects for discovery requests. The City has provided a copy of the only regulations implementing the Smoking Bans in the City—regulations that have been available in print and on the City's website since 2003—to Players in support of its motions for summary judgment.[4] Those regulations do not indicate that other policies have been or are contemplated to be adopted by the City to implement the Smoking Bans. The State has indicated that it does not have any capacity or intent to enforce the Smoking Bans in the City. *See* Affidavit of Richard W. Swenson, dated October 26, 2004 ("Swenson Aff.") ¶¶ 3–6 (stating that the State "does not enforce" Chapter 13 in the City, and "has not taken any action to ensure that there is [Chapter 13] compliance in the City"). Counsel for Defendants have stated on the record, and affiants for both the State and the City have indicated under oath, that no other "secret" statutory provision or regulation related to enforcement of the Smoking Bans exists to be turned over to Players. *See id.;* Affidavit of James K. Middleton III ("Middleton"), Director of Compliance and Code Enforcement, DHMH Bureau of Food Safety and Community Sanitation dated November 3, 2004 ("Middleton Aff.") ¶¶ 8–14 (discussing the process by which the Smoking Bans are enforced in the City).

To the extent that the City relies on other public health-related statutory provisions or regulations as a source of authority to enforce the Smoking Bans, these laws and regulations are readily accessible to Players without further discovery, and may be considered by the Court in review-

---

**4.** The regulations implementing Local Law 47 ("Local Law 47 Regulations") were attached in support of the City's motions (*see* Notice of Adoption of a Rule to Repeal and Reenact Chapter 10 of Title 24 of the Rules of the City of New York, attached as Ex. H to the Declaration of Ave Maria Brennan in Support of

the Motion to Dismiss of the City of New York, dated November 4, 2004 ("Brennan Decl.")), but are also available on the Internet site of the New York City Department of Health and Mental Hygiene ("DHMH") at http://www.nyc.gov/ html/doh/ downloads /pdf/smoke/tc6.pdf (last visited May 16, 2005).

ing the instant motions.[5] No further discovery is necessary to determine whether the City's use of these provisions to enforce the Smoking Bans complies with the Fourth Amendment.

Second, as discussed below, even though Players' contentions plausibly point to an inconsistency in the City's position on warrantless searches, the Court concludes that Defendants would prevail even if that issue were resolved in Players' favor. The inconsistency relates to the City's denial in its motion papers, in response to Players' charge that the City is conducting unlawful warrantless searches, that it does not permit warrantless searches of commercial premises. However, an affiant for the City, the Local Law 47 Regulations, and other materials related to enforcement of the Smoking Bans indicate that warrantless searches of commercial premises may be conducted under certain circumstances, which the City nonetheless maintains were constitutionally permissible.

On the one hand, Brennan, counsel for the City, has insisted that "the City's no-smoking law, and the rules promulgated thereunder, do not authorize warrantless or illegal searches which is the claim upon which plaintiff relies in making this cross-motion and the issue with respect to which 'plaintiff now needs to obtain additional discovery.'" (Brennan Opp. Decl. ¶ 3.) On the other hand, the Local Law 47 Regulations and affidavits submitted in support of the City's motion indicate that the City believes it may properly use the full extent of its health code enforcement powers to enforce the Smoking Bans. These regula-

tions clearly state that the City intends to enforce the Smoking Bans in the manner that it enforces every other City health law:

> In view of the intent of the Act, *i.e.*, to dissipate, if not eliminate the deadly effects of second-hand smoke, the Department believes it is appropriate and necessary to utilize the full range of the Department and Commissioner's regulatory and enforcement powers to further such intent. This provision serves to notify persons holding Department permits that these powers will be utilized to protect the non-smoking public from such effects in whatever manner may be authorized by applicable law.

(Local Law 47 Regulations at 3–4.) The Middleton Affidavit reveals that the regulation's reference to DHMH's regulatory and enforcement powers includes the agency's power to inspect premises for compliance with the City's health laws. That document also indicates that City health inspectors are authorized by local law to inspect commercial premises under at least one of three conditions: 1) the property is open to the public and may be entered by anyone, including health inspectors, without advance permission (Middleton Aff. ¶ 10); 2) although the property is private, the inspectors have been given permission to enter (*id.* ¶ 9); and 3) the portion of the premises being inspected is licensed by DHMH as a food service establishment and is thereby subject to inspection without advance notice under the conditions of the license and local law (*id.* ¶¶ 12–14.) Because Players

---

**5.** The Court may take judicial notice of the City's health-related ordinances and regulations. *See First English Evangelical Lutheran Church of Glendale v. Los Angeles County,* 482 U.S. 304, 328 n. 6, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (taking judicial notice of local ordinance); John W. Strong, *McCormick on Evidence* § 335 (5th Ed.1999) ("As to domestic law generally, the judge is not merely permitted to take judicial notice but required to do so . . . ."); cf. N.Y.C.P.L.R. § 4511(b) (authorizing New York state courts to take judicial notice of "ordinances and regulations of officers, agencies or governmental subdivisions of the state or of the United States").

holds a food service establishment license for its clubhouse (*id.* ¶ 3), local law permits DHMH to inspect the portion of the clubhouse covered by the license even without Players' permission.

It is difficult to reconcile Brennan's categorical insistence that the rules promulgated to implement the Smoking Bans do not authorize warrantless searches with the contrary evidence that the City's health inspection authority is used to enforce those laws. The Court does not see how these inspections can be anything other than warrantless searches, even if, as a separate matter for determination here, there may be sufficient constitutional authority to support the regulation and the inspections conducted pursuant to it.[6] *See New York v. Burger,* 482 U.S. 691, 699–700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (noting that the expectation of privacy protected by the Fourth Amendment "exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes"). But even if this factual conflict were resolved in favor of Players' position by concluding that

some warrantless inspections of commercial premises do take place, the Court finds nothing constitutionally suspect about such searches for reasons discussed below. Consequently, the Court concludes that Players has failed to satisfy the second element of the *Burlington* test.[7]

Turning to the third and fourth elements of the *Burlington* test, the Court concludes Mulhearn's Rule 56(f) affidavit fails to demonstrate that Players made reasonable efforts to obtain the facts it now seeks, much less that those reasonable efforts were unsuccessful. *See Paddington Partners,* 34 F.3d at 1138. As cases and commentators have noted, Rule 56(f) "will not be applied to aid a party who has been lazy or dilatory," 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2741 (perm. ed.2005), or who has failed to take reasonable steps to obtain access to the information sought. *See Paddington Partners,* 34 F.3d at 1139 ("[r]equests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored"); *Burlington,* 769 F.2d at 928 ("A party who

---

**6.** Perhaps the City believed that Players' Fourth Amendment challenge was directed only at the Smoking Bans themselves, as well as the text of regulations passed directly pursuant to the Smoking Bans. It is true that these texts do not directly discuss the extent of the City's authority to search for violations of the Smoking Bans. But if preexisting enforcement authority is used to secure compliance with the Smoking Bans, Players' challenge can only reasonably be read to challenge the legitimacy of that practice.

**7.** Because Players operates a City-licensed food service establishment on its premises, it is possible that the unannounced inspection of which Mulhearn complains in his affidavit, even assuming it occurred, may have been authorized by the City's food safety laws and regulations. (*See* Mulhearn Rule 56(f) Aff. ¶ 6.) On the other hand, the alleged search Mulhearn complains of may very well have

been unauthorized by any law. It is not this Court's duty to speculate on the facts and circumstances regarding this incident for two reasons. First, Mulhearn has failed to submit any affidavits by individuals with personal knowledge of the alleged event. Second, and more importantly, this suit is not before the Court as a motion to suppress evidence obtained as a result of a single alleged, purportedly unconstitutional, search. The suit instead contends that "[b]oth Local Law 47 and Chapter 13, and their respective regulatory schemes, are unconstitutional in violation of the Fourth Amendment to the United States Constitution." (Am.Compl.¶ 41.) Thus, the only matters relevant to the instant motions are those that implicate Players' facial challenge to the constitutionality of the Smoking Bans and their enforcement schemes, not the constitutionality of a specific alleged search.

both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need."); *Tucker Leasing Capital Corp. v. Marin Medical Management*, 833 F.Supp. 948, 955 (E.D.N.Y.1993) ("In order to obtain a continuance to permit additional discovery, the proponent seeking the continuance must establish that he was denied reasonable access to material requested and that the material requested constitutes potentially favorable information.").

The Court notes that Mulhearn's Rule 56(f) affidavit does not describe any efforts undertaken prior to this point to obtain materials related to the statutes' "regulatory schemes." Because the affidavit fails to satisfy the requirements established by *Burlington*, the Rule 56(f) motion could be could be rejected on this basis alone. *See Paddington Partners*, 34 F.3d at 1138. But even if the affidavit had alleged efforts to obtain the discovery now sought, it should be clear from the factual recitation above that Players is not entitled to rely on Rule 56(f) to delay matters further. In September of 2004, Mulhearn obtained permission to seek additional discovery from the State and City—even though numerous documents related to the Smoking Bans had been disclosed during the course of the *CLASH* litigation and even though the discovery did not appear relevant to Mulhearn's claims for relief—provided that he serve those discovery requests by September 30, 2004. He further stipulated to a briefing schedule for the case that contemplated the filing of motions to dismiss and, in the alternative, for summary judgment, by November 5, 2004. He nonetheless failed to serve these discovery requests on Defendants, either by September 30 or by the date on which the motions for summary judgment were filed, or to seek a continuance before the motions were filed so that he might propound his discovery requests.

Mulhearn also fails to explain why Players "was denied reasonable access to material requested," and whether "the material requested constitutes potentially favorable information," *Tucker Leasing*, 833 F.Supp. at 955. Given that one of Players' constitutional claims is that the Smoking Bans violate the Fourth Amendment, despite Mulhearn's protestations of surprise at the content of Defendants' motions, Players had to have known that Defendants' motions would claim that the statutes and regulatory schemes at issue here do not violate the Fourth Amendment. The relevant regulations and policies appear to have been both publicly available and provided by Defendants in support of their motions.[8] If Players now asserts it lacks copies of all of the relevant regulations, it has only itself to blame.

Players claims that it would be unfair to require it to " 'anticipate' all factual issues which may potentially be raised by a defendant in a pre-answer motion to dismiss summary judgment [sic]." (*See* Plaintiff's Reply Memorandum of Law in Further Support of its Cross–Motion, dated February 28, 2005 ("Players' Reply Mem.") at 4.) This argument might have had some force had Players not already failed to serve any discovery requests on Defendants by the

---

**8.** The State and City did not provide Players with information on the extent of City's health inspection authority because the Amended Complaint did not purport to challenge that authority. However, to the extent that the scope of that authority is made relevant to Players' Fourth Amendment claim by the City's use of that authority as a means of ensuring compliance with the Smoking Bans, the relevant rules and regulations are a matter of public record. Thus, the additional documents Players seeks, to the extent they exist, are readily accessible to any person through the exercise of minimal diligence.

deadline it agreed to meet, and had any question of fact raised by Defendants' motion papers not been immaterial to the Court's disposition of this matter. The Court thus denies Players' Rule 56(f) motion.

## B. *THE POSTURE OF THE CASE*

The Court must determine next whether it may rule on Defendants' motions without providing Players an opportunity to conduct an additional round of briefing in opposition to Defendants' motions. As discussed above, Mulhearn submitted a letter to the Court on March 23, 2005, arguing that Players was entitled to submit an additional brief opposing Defendants' motions even if the Rule 56(f) motion were denied. Mulhearn's letter further relied on ambiguities allegedly contained in certain of the Court's prior orders to claim that Players should be entitled to submit further briefing.

 To the extent Players' request for further briefing has not been mooted by its submission of supplemental papers in opposition to Defendants' motions, the request must be denied for two reasons. First, there is no support for its argument that a Rule 56(f) motion, no matter how frivolous, automatically stays a motion for summary judgment and entitles the party resisting summary judgment to submit additional briefing even if the Rule 56(f) motion is denied. Rule 56(f) does not contemplate such an automatic stay: it concludes that an application for summary judgment may be refused or continued only "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). Cases rejecting Rule 56(f) motions have invariably proceeded to consider motions for summary judgment without sup-

plying additional time for discovery. *See, e.g., Paddington Partners,* 34 F.3d at 1135–36 (affirming grant of summary judgment despite Rule 56(f) movant's assumption "that there would be discovery if it lost" on one of the issues presented by the motion); *Burlington,* 769 F.2d at 922 (affirming grant of summary judgment on issue presented by motion upon denial of opposing party's Rule 56(f) motion); *Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 948 F.Supp. 285, 296 (S.D.N.Y.1996) (concluding that where a "request for additional discovery in order to oppose [defendant's] motion for summary judgment should be denied, ... [defendant's] motion for summary judgment is not premature"). *Lawford v. New York Life Ins. Co.,* 739 F.Supp. 906 (S.D.N.Y. 1990), which Players cites in support of its argument, is not to the contrary. Rather, it accurately states in a footnote that Rule 56(f) may be used to stay a summary judgment motion while "necessary discovery is conducted." *Id.* at 917 n. 12. It does not purport to state that the mere filing of a Rule 56(f) motion acts to stay a summary judgment motion—much less to authorize additional briefing—where there is no "necessary discovery" to conduct.

Second, Players' failure to submit any opposition to Defendants' motions at an earlier date can only be blamed on its own tactical decisions in the litigation. As described in detail above, Mulhearn signed a stipulation reflecting that he knew Defendants would be moving for dismissal *and* summary judgment, and that he agreed to "serve [Players'] oppositions to the defendants' motions *and* serve its cross-motions" by November 26, 2004. (Stip. ¶ 1 (emphasis added).) After failing to file any of the promised materials for three weeks past that date, he wrote to the Court and requested until December 28, 2004 to submit "opposition papers." (Let-

ter from Mulhearn to the Court of 12/17/04.) It is unclear why Mulhearn could have ·believed that he could avoid submitting any opposition papers by December 28, 2004, when he had twice committed himself to doing so.

Mulhearn may believe that the Court's February 17 Order authorized a further round of briefing. But that Order, after expressing confusion concerning his request for further briefing, simply directed the parties to "confer and submit a stipulated briefing schedule for the *remaining* motion timetable." (February 17 Order (emphasis added).) In so stating, the Court merely sought to compel the parties' agreement to a briefing schedule, to the extent any dispute existed and any portion of the motions still remained unaddressed by the parties' submissions. If Mulhearn was confused by the meaning of that Order, the Court is not responsible for Mulhearn's failure to ensure that the Order was distributed to Defendants, to confer with Defendants, or to seek further clarification from the Court before submitting his final reply brief. Mulhearn had his opportunity to submit these opposition papers; he failed to avail himself of that opportunity. "It is neither the role of this Court, nor the burden of defendant[s] . . . to relieve [Players] from the adverse consequences of its failed litigation strategies." *Allstate,* 948 F.Supp. at 296.

The Court will therefore proceed to consider Defendants' motions without obtaining additional briefing from the parties. As in *CLASH,* the Court has before it motions for both dismissal and summary judgment.[9] Also as in that case, the Court

finds it preferable to consider the motions for summary judgment rather than simply the motions to dismiss, as it will permit the Court to review the entire record that the parties have submitted in support of their positions. *See CLASH,* 315 F.Supp.2d at 471.

## C. *SUMMARY JUDGMENT STANDARD*

The Court may grant Defendants summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the Court stated in *CLASH,* "[t]hroughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party." *CLASH,* 315 F.Supp.2d at 471 (citing *Hanson v. McCaw Cellular Communications, Inc.,* 77 F.3d 663, 667 (2d Cir.1996)).

After reviewing the parties' submissions and statements at the April 28 Hearing, the Court concludes that no facts material to the disposition of the case are in dispute. Even if all inferences are drawn in favor of Players, the case is ripe for decision on summary judgment.[10]

---

**9.** In *CLASH,* the City did not initially move for summary judgment, while the State had so moved. Plaintiffs in that case had also moved for summary judgment. The Court chose *sua sponte* to convert the City's motion to dismiss · into a motion for summary judgment in order

to consider all of the motions and supporting affidavits submitted by the parties. *See CLASH,* 315 F.Supp.2d at 471.

**10.** To the extent that Players' supplemental submission in opposition to Defendants' mo-

## D: CONSTITUTIONAL CHALLENGES

### 1. Fourth Amendment

In relevant part, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures." U.S. Const. am. IV. Players argues that both Local Law 47 and Chapter 13 violate the Fourth Amendment by authorizing warrantless searches of commercial premises. (See Am. Compl. ¶ 34.) After reviewing the Smoking Bans, the implementing regulations, and the rules governing the City's authority to secure compliance with health-related laws and regulations, the Court concludes that the statutes and their regulatory schemes do not violate the Fourth Amendment.

A review of the statutory schemes reveals that only the City's use of its health inspection authority to enforce the Smoking Bans raises any Fourth Amendment question. The Smoking Bans themselves do not claim to regulate Defendants' authority to enforce those laws.[11] The State has explicitly delegated enforcement of Chapter 13 within the City to DHMH. See

N.Y. Pub. Health Law § 1399–t(1) ("In a city with a population of more than one million [i.e., New York City] the enforcement officer [for Chapter 13] shall be the department of health and mental hygiene of such city which shall have sole jurisdiction to enforce the provisions of this article in such city."). As stated above, the State has not passed any regulations implementing Chapter 13 that could conceivably be relevant to Players' Fourth Amendment challenge. Local Law 47 also does not amend or enhance the City's preexisting enforcement authority.

The Local Law 47 Regulations and the Middleton Affidavit make clear, however, that the City seeks to enforce the Smoking Bans using the full array of inspection powers available to DHMH. As stated above, the Local Law 47 Regulations put the public on notice that the City intends "to utilize the full range of the Department [of Health & Mental Hygiene] and Commissioner's regulatory and enforcement powers" to reduce the harmful effects of second-hand smoke. (Local Law 47 Regulations at 3–4.) As relevant to

---

tions may be deemed inadequate for failing to submit affidavits or other evidence setting forth "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), the Court must nonetheless determine whether the State and City have met their burden on summary judgment of demonstrating the absence of any material issues of fact. See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004):

> This Court has made clear, however, that where the non-moving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial."

Id. (quoting Amaker v. Foley, 274 F.3d 677, 681 (2d Cir.2001)).

**11.** The portion of Chapter 13 that authorizes "any person who desires to register a complaint ... [to] do so with the appropriate enforcement officer," see N.Y. Pub. Health Law § 1399–t(3), quoted in Mulhearn Rule 56(f) Aff. ¶ 7, is not "prima facie evidence of a regulatory scheme which encourages warrantless searches of commercial premises" (Mulhearn Rule 56(f) Aff. ¶ 7 (emphasis in original)), as Mulhearn asserts in support of Players' motion. Instead, it explains that individuals may report complaints to the enforcement officer designated by their communities. Section 17–507 of the New York City Administrative Code, which predates Local Law 47, similarly authorizes individuals to submit complaints alleging violations of the City's non-smoking laws. See N.Y.C. Admin. Code § 17–507(b). Players does not cite this, or any other statutory provision other than the portion of Chapter 13 cited above, in support of its Fourth Amendment argument.

Players' Fourth Amendment challenge, those enforcement powers include powers to inspect commercial establishments for compliance with the Smoking Bans. The Middleton Affidavit indicates that DHMH inspectors conduct warrantless inspections of commercial premises under three circumstances: 1) when the premises is open to the public; 2) when permission to enter is given; and 3) if the area being searched is a licensed food service establishment subject to inspection under rules governing those licenses. Health inspectors visiting a food service establishment may now inspect for compliance with the Smoking Bans along with other health laws and regulations. (Middleton Aff. ¶¶ 8–13.) [12]

■ Moreover, only DHMH's inspections of private food service establishments without permission, express or implied, would raise any Fourth Amendment concerns. Enforcement officers may, consistent with the Fourth Amendment and without requiring a warrant, search portions of commercial premises that are open to the public. *See Washington Square Post # 1212 American Legion v. Maduro*, 907 F.2d 1288, 1291 (2d Cir.1990) (noting "that which is 'knowingly expose[d] to the public ... is not a subject of Fourth Amendment protection'") (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Searches of premises authorized by consent raise no Fourth Amendment concerns. *See*

*Schneckloth v. Bustamonte* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (noting "that a search authorized by consent is wholly valid").

■ Inspections without consent conducted in private premises containing licensed food service establishments, however, could raise lesser, but still, significant constitutional concerns. Owners and operators of these premises are entitled to the protections of the Fourth Amendment, which traditionally require proof of a warrant and probable cause before a search can be conducted. *See New York v. Burger*, 482 U.S. 691, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). These traditional criteria, however, have lessened application where the property is being used in a "closely regulated" industry, due to the lessened expectation of privacy associated with operating in that industry. *See id.* As many courts have held and as Players does not contest, the food industry is a quintessential example of an industry that is "closely regulated." *See, e.g., Contreras v. City of Chicago*, 920 F.Supp. 1370 (N.D.Ill.1996) ("*Contreras I* "), aff'd in relevant part, 119 F.3d 1286 (7th Cir.1997) ("*Conteras II* "); *United States v. Gel Spice Co., Inc.*, 601 F.Supp. 1214, 1229 (E.D.N.Y.1985) (holding that warrantless inspections of a food storage warehouse were permissible on the grounds that "[p]ublic interest is deeply involved in the

12. The City has also published a guide to operating food establishments, available over the Internet, that affirms the City's assertion of authority to inspect food service establishments for compliance with the Smoking Bans. It states as follows:

> The Department of Health and Mental Hygiene is responsible for enforcing Local law 47 .... Compliance with the law will be monitored during the routine inspection of your establishment. In addition, the Department will respond to complaints lodged by the public. If the Department receives a

complaint alleging smoking in the regulated areas of your establishment, an inspector may be sent to conduct an unannounced inspection, and if warranted, issue a notice of violation.

New York City Department of Health and Mental Hygiene, *Operating a Food Establishment in New York City* 31 (2005) ("*Operating a Food Establishment* "), available at http://www.nyc.gov/ html/doh /downloads/ pdf/ inspect/inspect –guide–2005–part3. pdf (last visited May 18, 2005).

food industry. Undetected violations could adversely affect public health and well-being."); *United States v. New England Grocers Supply Co.*, 488 F.Supp. 230, 238 (D.Mass.1980).

In *Burger*, the Supreme Court held that warrantless inspections were permissible even in the context of a closely regulated business, however, only if three criteria are met: 1) "there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; 2) "the warrantless inspections must be necessary to further the regulatory scheme"; and 3) the inspection program, "in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702–03, 107 S.Ct. 2636 (internal brackets, citations, and quotation marks omitted); *see also Anobile v. Pelligrino*, 303 F.3d 107, 118 (2d Cir.2002) (holding that "the warrantless search exception applies to searches authorized pursuant to valid agency regulations, as well as to statutes").

The statutes and regulations governing the City's use of its inspection authority to enforce the Smoking Bans in regulated areas of food service establishments satisfy *Burger*'s three-part test. Regarding the first prong, the City clearly has a substantial government interest in ensuring the health of its food supply, and of customers of food service establishments. *Contreras II* and other cases have already noted the obvious proposition that protecting the safety of the food supply represents an important governmental interest. *See Contreras II*, 119 F.3d at 1290; *cf. North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (authorizing warrantless seizures by health officials "based upon the right and duty of the state to protect and guard, as far as possible, the lives and health of its inhabitants"). Both food safety and the health of food service workers and patrons may be endangered by the consumption of tobacco products in and around food preparation areas; the Court has previously noted that the concern for the safety of individuals exposed to secondhand smoke represented an "important government interest." *See CLASH*, 315 F.Supp.2d at 480; N.Y. City Health Code § 81.27 ("Smoking or use of tobacco in any form in any room where food is prepared, processed or packaged is prohibited.").

Regarding the second prong of the *Burger* test, the Court concludes that warrantless inspections are necessary to further the regulatory scheme established by the City's health ordinances, including its Smoking Bans, in food service establishments such as Players. As the district court in *Contreras I* stated regarding food inspections, "[a]dvance knowledge of an impending health inspection would provide restaurant owners with the opportunity to take temporary remedial measures designed to mask or conceal violations ... that would surely undermine the purposes of the City's health and sanitation ordinances." *Contreras I*, 920 F.Supp. at 1390. The City's objectives in applying the Smoking Bans to licensed food service establishments would similarly be frustrated by imposition of a notice or warrant requirement; violators could frustrate the City's objectives in passing Local Law 47 by taking temporary remedial measures that would conceal violations (*e.g.*, by extinguishing and putting away cigarettes) if notice or a warrant were required before entry to those establishments could be gained.

Finally, the third prong of the *Burger* test is satisfied by the comprehensiveness and defined scope of the City's inspection program. *Burger* held that this condition was satisfied if the ordinances are "suffi-

ciently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to specific inspections undertaken for specific purposes." *Burger*, 482 U.S. at 703, 107 S.Ct. 2636. The City's health inspection ordinances and regulations fully satisfy this condition by making clear that food service establishments' receipt of a City license is granted subject to the licensees' agreement to submit to frequent inspections that will secure their compliance with public health-related laws. The New York City Charter explicitly authorizes the Commissioner of DHMH and his or her designees to "at reasonable times, and pursuant to a search warrant when required by law, without fee or hindrance enter, examine and inspect all vessels, premises, grounds, structures, buildings and every part thereof and all underground passages of every sort in the city for compliance with the provisions of law enforced by the department and its rules and regulations . . . ." N.Y. City Charter § 566. Owners of premises regulated by DHMH "shall at all reasonable times, when required by any such officers or employees, give them free access thereto." [13] *Id.* A license will not be granted without a pre-permit inspection, *see* N.Y. City Health Code § 81.05(c), and DHMH is explicitly authorized by the code to "inspect any premises, matter or thing within its jurisdiction, including but not limited to any premises where an activity regulated by this Code is carried on, and any record required to be kept pursuant to this Code." N.Y. City Health Code § 3.01(a). Middleton's affidavit, and other regulatory materials, make clear that inspectors are limited to searching areas of premises that are covered by the license. *See, e.g., Operating a Food Establishment* at 31 (informing licensees of DHMH's claimed authority to search "the regulated areas of your establishment" for compliance with Local Law 47). Thus, the regulatory scheme also makes clear that the "time, place, and scope of the inspection is limited." *Burger*, 482 U.S. at 711, 107 S.Ct. 2636.

■ Players' counterarguments are unpersuasive. First, Players argues that, because the Smoking Bans are "quasi-criminal," they should be subject to a higher level of scrutiny under the Fourth Amendment. (*See* Players' Supplemental Mem. at 3.) This argument is completely misplaced. *Burger* supplies the relevant test for administrative search schemes related to "closely regulated" industries. There is no further, heightened level of scrutiny to be applied to such schemes where the sanctions for violating the regulatory schemes that the inspections were designed to enforce are "quasi-criminal" or criminal. *Burger*, for example, affirmed a warrantless administrative search scheme that was explicitly designed to root out evidence of crimes, in that case, motor vehicle theft. *See Burger*, 482 U.S. at 708–09, 107 S.Ct. 2636. The cases cited by Players apply higher levels of scrutiny to statutes in the context of vagueness challenges under the Due Process Clause of the Fourteenth Amendment, not to Fourth Amendment challenges of the type raised here. *See* Players Supplemental Mem. at 3 (citing *Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377, 396–97 (2d Cir.2004)) (noting that a more stringent

---

**13.** This provision of the City Charter limiting searches to "reasonable times" vitiates Players' argument that the Smoking Bans, and their implementing regulations, permit enforcement officers to "conduct a search or inspection of the entire commercial establish- ment for smoking activities at any time of the day or night." (Am.Compl.¶ 39.) Identical language was held to satisfy the third prong of the *Burger* test in *Contreras*. *See Contreras I*, 920 F.Supp. at 1391.

level of vagueness analysis was warranted where the challenged statutes "implicat[ed] constitutionally protected rights"); *United States v. Clinical Leasing Service, Inc.,* 925 F.2d 120, 122 (5th Cir.1991) (holding that a more stringent vagueness test applies when the challenged statute is "quasi-criminal").)

Players' second challenge to the statute is similarly unavailing. It argues that, particularly where an administrative search is conducted pursuant to a complaint received by DHMH, an inspection's purpose transforms from an effort to obtain administrative compliance to a "quest for evidence." According to a New York State trial court decision cited by Players, "once the purpose of the search moves from administrative compliance to a quest for evidence to be used in a criminal prosecution, the state may only enter to make the search if it has a warrant based on probable cause." *New York State Commission on Government Integrity v. Congel,* 142 Misc.2d 9, 535 N.Y.S.2d 880, 887 (N.Y.Sup.Ct.1988) (citing *Michigan v. Tyler,* 436 U.S. 499, 508, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)), *aff'd as modified,* 156 A.D.2d 274, 548 N.Y.S.2d 663 (1st Dep't 1989).

But even if this legal proposition is generally valid, there is no evidence here that the challenged inspection scheme is intended to achieve anything other than administrative compliance with the Smoking Bans. The Smoking Bans and their supporting regulations establish civil, rather than criminal, penalties for violations that are intended to secure compliance with a civil administrative scheme established to preserve the public health. *See* N.Y. Pub. Health Law § 1399–v (authorizing imposition of "a civil penalty" for a violation of Chapter 13); N.Y.C. Admin. Code § 17–508(e) (same as to Local Law 47). Players has not alleged that the City is using its administrative search powers to engage in pretextual searches for evidence of crime in areas covered by food service permits, *cf. Winters v. Board of County Commissioners,* 4 F.3d 848, 854 (10th Cir.1993) (holding that police cannot rely on a pretextual administrative search coupled with the plain view doctrine to justify seizure of evidence from a regulated business), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1539, 128 L.Ed.2d 192 (1994), nor has it pointed to any action or evidence suggesting that the City's use of its health inspection scheme to enforce the Smoking Bans is intended for any purpose other than to "dissipate, if not eliminate the deadly effects of secondhand smoke." [14] (Local Law 47 Regulations at 3–4.)

Because the Smoking Bans and their enforcement schemes comply with the re-

---

**14.** The fact that the City may conduct some administrative searches in response to complaints received by DHMH does not change the analysis. Players is challenging the entire regulatory scheme associated with the Smoking Bans, not any specific search pursuant to the Bans, and has not alleged that the statute violates the vagueness or overbreadth doctrines by permitting searches that would violate the Fourth Amendment. *Compare S & S Pawn Shop Inc. v. City of Del City,* 947 F.2d 432, 439–40 (10th Cir.1991) (considering and rejecting such a challenge to an administrative search scheme). Even if a specific search in response to complaints were being challenged, such a search would raise no constitutional concerns where it is being conducted to secure compliance with a civil administrative scheme, rather than to find evidence of crime; a contrary result would require a warrant whenever a health inspector conducted an inspection based on prior evidence of health code violations or complaints that code violations endangering the public health were taking place. The Court notes that the Seventh Circuit, in *Contreras II,* affirmed the constitutionality of a warrantless administrative search of a food service establishment conducted in response to complaints received by Chicago public officials. *See Contreras II,* 119 F.3d at 1288–89.

quirements of the Fourth Amendment, the Court grants Defendants summary judgment on Players' Fourth Amendment claim.

### 2. *Equal Protection Clause*

■ The second count of Players' Amended Complaint asserts that the Smoking Bans violate the Equal Protection Clause of the Fourteenth Amendment by treating private clubs such as Players differently from tobacco bars or cigar bars. Under The Smoking Bans, smoking is permitted in a bar that "generated ten percent or more of its total annual gross income from the on-site sale of tobacco products and the rental of on-site humidors, not including any sales from vending machines," and is registered with the proper authorities. This exemption may be renewed annually only for as long as the bar continues to derive more than ten percent of its revenue from tobacco-related sales and as long as it does not "expand[ ] its size or change[ ] its location." N.Y. Pub. Health Law § 1399–q(5) (codifying relevant portion of Chapter 13); N.Y.C. Admin. Code §§ 17–502(jj), 17–503(a)(20) (codifying relevant portions of Local Law 47).[15] Membership organizations may also be exempted from the requirements of the Smoking Bans, but only as long as "all of the duties with respect to the operation of such association ... are performed by members of such membership association who do not receive compensation of any kind from the membership organization or any other entity for the performance of such duties." N.Y. Pub. Health Law § 1399–q(4); N.Y. City Admin. Code § 17–503(a)(22). Because Players employs non-members to perform various duties for the organization, it is not entitled to benefit from this exemption.

Players claims that the differing treatment accorded tobacco bars and membership clubs such as Players that employ non-members under the statutes has no rational basis (Am.Compl.¶ 47), and infringes members of Players' "exercise of their fundamental First and Fourteenth Amendment rights to free speech, freedom of assembly and freedom of association." (*Id.* ¶ 45.) According to Players, this unequal treatment is "based in part on impermissible considerations, such as Defendants' intent to inhibit Plaintiff, and other private clubs, from fully exercising their constitutional rights to freedom of association, freedom of assembly, and freedom of speech" (*id.* ¶ 57), and has caused numerous members of the club to cancel their memberships and to reduce participation in club activities. (*Id.* ¶ 59.)

These arguments already have been essentially considered and rejected by the Court in *CLASH*. The *CLASH* plaintiffs also argued that the smoking bans violated the Equal Protection Clause, in that case by "classifying smokers as second class citizens." *See CLASH*, 315 F.Supp.2d at 480. The Court, applying clear Supreme Court precedent, concluded that "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 481 (quoting *FCC v. Beach Communications*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Finding

---

**15.** The relevant language in Chapter 13 and Local Law 47 is identical, except that Local Law 47 requires tobacco bars to have met the conditions established by the statute in 2001, while Chapter 13 only requires compliance with these conditions beginning during calendar year 2002.

that the statute's alleged distinction between smokers and non-smokers did not create a suspect classification, and that limitations on smoking did not infringe fundamental constitutional rights, the Court applied a rational basis standard of review to the statute and upheld it against the *CLASH* plaintiff's Equal Protection challenge. *See id.* at 483–84.

Despite the conclusory allegations of Players' Amended Complaint, the Court sees no reason to analyze the Smoking Bans' creation of a distinction between tobacco bars and membership organizations with paid employees using a heightened level of scrutiny. Distinctions between tobacco bars and membership organizations are no more suspect than the alleged distinction between smokers and non-smokers that this Court held to be permissible in *CLASH.* As discussed in *CLASH* and in greater detail *infra,* individuals have no "fundamental" constitutional right to smoke tobacco. *See CLASH,* 315 F.Supp.2d at 473–74, 482. While individuals' freedom of association, freedom of assembly, and freedom of speech merit constitutional protection, there is no basis for concluding that the Smoking Bans infringe those rights.

Consequently, the two-step rational basis review applied to the Equal Protection challenge raised in *CLASH* also ought to apply to the classification challenged here. If anything, the distinction presented by Players between it and tobacco bars, two claimants for exemptions from restrictive public health legislation, merits even less judicial scrutiny than than the classification at issue in *CLASH,* which more directly challenged Defendants' powers to regulate second-hand smoke at all. *See Beach Communications,* 508 U.S. at 315–16, 113 S.Ct. 2096 (internal citations, brackets, and quotation marks omitted):

These restraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing. Defining the class of persons subject to a regulatory requirement— much like classifying governmental beneficiaries—inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

As *CLASH* noted, several other New York state and federal courts have upheld classifications contained in earlier laws regulating smoking and second-hand smoke against Equal Protection challenges using the rational basis standard of review. *See CLASH,* 315 F.Supp.2d at 496–97 (citing *Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam County Dep't of Health,* 178 F.Supp.2d 396, 405–06 (S.D.N.Y.2001); *Justiana v. Niagara County Dep't of Health,* 45 F.Supp.2d 236, 242–43 (W.D.N.Y.1999); *Sayville Inn 1888 Corp. v. County of Suffolk,* No. 98–CV–04527, 1998 WL 34202846, at *2 (E.D.N.Y. Aug. 3, 1998); *Fagan v. Axelrod,* 146 Misc.2d 286, 550 N.Y.S.2d 552, 556–59 (1990)).

Furthermore, there is no evidence on the record of any improper or irrational animus motivating the distinction between tobacco bars and membership organizations with employees, as Players alleges. Defendants are not required to prove that they actually were motivated by rational purposes, although the statute certainly is supported by rational distinctions between commercial entities such as tobacco bars, which might be forced to close if the ban were applied to them, and membership organizations such as Players, which do not directly derive revenue from smoking-related activities. *See Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096 ("be-

cause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature").

For all of these reasons, the Court concludes that Defendants are entitled to summary judgment on Players' equal protection claim.

### 3. *First Amendment*

■ In count three of the Amended Complaint, Players argues that the Smoking Bans are substantially overbroad in violation of the First Amendment because they "reach and affect a substantial amount of constitutionally protected conduct, namely the rights of Plaintiff's members to have and enjoy freedom of association, freedom of assembly and freedom of speech, as set forth in the First Amendment." (Am.Compl.¶ 63.) According to Players, the enactment of the Smoking Bans "may dissuade Plaintiff's members or potential members from engaging in social discourse at THE PLAYERS CLUB or from joining or maintaining membership at THE PLAYERS CLUB, thereby substantially impinging their rights to freedom of association, freedom of assembly and free speech." (*Id.* ¶ 64.) Therefore, Players argues, the Smoking Bans should be held invalid on their face. (*See id.* at 20).

As the Supreme Court has held, "[t]he traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Overbreadth represents a limited exception to the rule that permits litigants "to challenge a statute not because their own rights of free ex-

pression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 611, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The doctrine "has been employed by the Court sparingly and only as a last resort." *Id.* at 613, 93 S.Ct. 2908. Consequently, the Supreme Court has held, "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. 2908.

The Court notes initially that it is unclear why Players is using the overbreadth doctrine as a basis for challenging the statute, unless it is somehow seeking to avoid the Court's prior rulings on the *CLASH* plaintiffs' First Amendment challenges to the Smoking Bans. Is it conceding that the statutes may be applied constitutionally to it but that, nonetheless, they should be ruled unconstitutional because they have the effect of causing others "to refrain from constitutionally protected speech or expression"? If so, the Court finds Players' allegations, and the evidence currently before the Court, plainly inadequate to sustain this claim. The Smoking Bans are entirely targeted at conduct—the act of smoking in certain places—rather than at speech, association, or assembly, which are not regulated by the statutes. Players has not alleged, nor has it introduced any evidence suggesting, that "a substantial number of instances exist in which the [l]aw cannot be applied constitutionally," *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), as it must do to prevail on its overbreadth claim. *See id.* Even if the Court credited

Players' unsubstantiated allegation that the existence of the Smoking Bans causes a net decrease in the total amount of speech, association, and/or assembly that takes place at its location, and presumably at other locations affected by the statutes, due to smokers' avoidance of those locations, the statutes cannot be said to have the real and substantial effect on constitutionally-protected speech and expression necessary for these conduct-based restrictions to be declared substantially overbroad. *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908. Patently, if fewer people frequent bars and other locations to which the Smoking Bans apply, quantitatively less speech, association, and assembly is bound to occur in those places. But causally, this diminution, to the extent it actually occurs, would be an effect of those persons' inability to smoke at the covered establishments, and, in consequence, their voluntary choice to lessen or withdraw patronage, rather than of any unreasonable limitation of their right to speak, associate, or assemble there.

Alternatively, if the Court were to construe Players' Amended Complaint in order to allow it to assert direct First Amendment challenges to the Smoking Bans on the basis of the club's, or its membership's, freedoms of association, assembly, and speech, its challenges still would not succeed. As the Court stated in *CLASH*, the right to associate is only implicated where government intrudes into a person's choice to "enter into and maintain certain intimate human relationships," or where "governmental action interferes with an organization engaged in activities protected by the First Amendment, such as speech, assembly, redress of grievances, and the exercise of religion." *CLASH*, 315

F.Supp.2d at 472 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–19, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)).

Players cannot argue that the rights of its members to enter into intimate human relationships, which are defined by "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life," *Roberts*, 468 U.S. at 620, 104 S.Ct. 3244, are infringed by the Smoking Bans. The allegations contained in Players' Amended Complaint suggest that Players might be able to demonstrate through further fact-finding that, through joining the club, its members enter into intimate human relationships deserving of constitutional protection: unlike the Jaycees, which were found not to create those intimate associations through membership in the organization, Players is described as a relatively small, private, exclusive and secretive club. *Compare* Am. Compl. ¶ 13 ("Membership in THE PLAYERS CLUB is selective and exclusive, as new members must be nominated by existing members, appear before a nominating committee and receive a majority of affirmative votes from THE PLAYERS' Board of Directors before gaining membership"), *with Roberts*, 468 U.S. at 621, 104 S.Ct. 3244 (noting that the "local chapters of the Jaycees are large and basically unselective groups"); *see also id.* (noting that intimate human relationships "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.").[16]

**16.** The Court notes, however, that with 750 members (*see* Am. Compl. ¶ 11), Players would have a difficult time demonstrating that its members all share the "distinctively personal aspects" of their lives necessary for their rights of intimate association to be im-

But even if Players had not waived the opportunity to present facts in support of its claim to the right of intimate association by failing to submit any affidavits or other materials in opposition to Defendants' motions, the Court finds that the club could not demonstrate that any such right was infringed by the Smoking Bans. Players does not cite to, and the Court cannot locate, any provision of the Smoking Bans or their regulatory schemes that purports to regulate membership, or interaction among members, in any clubs covered by the statutes. Smokers' ability to join Players is completely unaffected by the Smoking Bans. At worst, interaction among members could be affected by the laws only incidentally.

Players, for example, claims that its mission is to "promote social intercourse amongst actors, writers and artists by providing its members with a relaxed and intimate meeting place for them to drink, eat, play billiards, perform and attend various live plays and performances, and smoke." (Am.Compl.¶ 12.) It is difficult to see how the social intercourse, and social intimacy, that the club seeks to facilitate could be unconstitutionally infringed merely because the meeting place provided by the club can no longer allow indoor smoking, even if it is still available for the full range of other social and recreational activities the club provides. To conclude otherwise "would be to embellish the First Amendment with extra-constitutional protection for any ancillary practice adherents seek to entwine around fundamental free-

doms, as a consequence of which the government's power to regulate socially or physically harmful activities may be unduly curtailed." *CLASH*, 315 F.Supp.2d at 474. There is thus no basis for concluding that Players' members' rights of intimate association are infringed by the Smoking Bans.

Players also may be able to argue that it engages in expressive conduct protected by the First Amendment. According to the Supreme Court:

> To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in "expressive association." The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private.

*Boy Scouts of America v. Dale,* 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). Players, as a social club intended for members of the theatrical, literary, and artistic community that enables members to "perform and attend various live plays and performances" (Am.Compl.¶ 12), could claim that the interaction among its members is protected by the First Amendment's right of expressive association. Nonetheless, the Smoking Bans cannot be held to violate these rights for the reasons stated in *CLASH* and other cases. *See Fighting Finest, Inc. v. Bratton,* 95 F.3d 224, 228 (2d Cir.1996) ("The Supreme

plicated by their membership in the organization. *See New York State Club Ass'n,* 487 U.S. at 12, 108 S.Ct. 2225 (noting that a law prohibiting discrimination in certain private clubs could not infringe on at least some club members' rights of intimate association because "[t]he clubs that are covered under the Law contain at least 400 members. They thus are comparable in size to the local chap-

ters of the Jaycees that we found not to be protected private associations in *Roberts,* and they are considerably larger than many of the local clubs that were found to be unprotected in [*Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) ], some which [sic] included as few as 20 members.").

Court has held that, consonant with the First Amendment, government may engage in some conduct that incidentally inhibits protected forms of association.... To be cognizable, [government] interference with associational rights must be 'direct and substantial' or 'significant.'") (quoting *Lyng v. International Union, United Auto., Aerospace and Agric. Implement Workers of Am.,* 485 U.S. 360, 366–67 n. 5, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988)); *CLASH,* 315 F.Supp.2d at 473–74.

No such significant, direct, or substantial interference with associational rights can be found in this case. As stated in *CLASH,* while the Smoking Bans restrict where a person may smoke, they do not "unduly interfere with smokers' right to associate freely with whomever they choose in the pursuit of any protected First Amendment activity." *CLASH,* 315 F.Supp.2d at 473. Members of Players who are smokers "remain free to associate and assemble as they please." *Id.* at 475. Neither Players, nor its members, has been compelled to speak in favor of the Smoking Bans, or to accept members whose views are inconsistent with their beliefs concerning the statutes. *Cf. Boy Scouts of America,* 530 U.S. at 648, 120 S.Ct. 2446 (holding that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints").

Players' Amended Complaint also argues that a specific practice traditionally engaged in by the association has been prohibited by the Smoking Bans. According to Players, the club "has traditionally honored certain members with a pipe ceremony, which involves the smoking of tobacco products on the premises. That time-honored ceremony is now barred by the enactment of Local Law 47 and Chapter 13." (Am.Compl.¶ 62.) But the Court fails to see how the Smoking Bans would prohibit this hallowed ceremony from taking place altogether, rather than simply restricting one aspect of the conduct associated with the ceremony or the location at which the ceremony may take place. Players does not explain, for example, why the ceremony could not continue to be performed with suitable non-tobacco products. Even if the members of Players possessed an associational right to engage in this activity, "the First Amendment does not compel government to facilitate the ease with which an individual may exercise associational rights." *CLASH,* 315 F.Supp.2d at 475 (quoting *Fighting Finest,* 95 F.3d at 228); *cf. Employment Div., Dept. of Human Resources of Oregon v. Smith* 494 U.S. 872, 878–879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (concluding, in permitting punishment of individuals who ingested peyote, a controlled substance, as part of their religious practices, that "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate").[17] Thus, even if the Smoking

---

**17.** Players' reliance on *Latino Officers Association v. City of New York,* 1998 WL 80150 (S.D.N.Y. Feb. 25, 1998), is misplaced. That decision held that allegations of "unnecessary surveillance" and "intimidation" of the Latino Officers Association ("LOA") by the City Police Department stated a claim that the LOA's freedom of association was violated by these coercive tactics. *See id.* at *5. The court in that case compared LOA's allegations of intimidation to the tactics designed to intimidate members of the NAACP that were held unconstitutional in *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). *See Latino Officers Association,* 1998 WL 80150, at *5. Players, unlike the plaintiffs in *Latino Officers Association,* has failed to allege or to introduce any

Bans minimally and incidentally burden Players' members' ability to engage in the purported pipe ceremony as it was previously practiced, the statutes do not infringe the club's, or its members', freedom of expressive association.

Any free speech claim that Players might raise is also foreclosed by the Court's *CLASH* decision. In that decision, the Court extensively reviewed, and rejected, arguments that the Smoking Bans infringed smokers' free speech rights. *See CLASH*, 315 F.Supp.2d at 476–80. As the Court concluded there: "In short, the right of free speech, like the rights of assembly and association, is not inherently accompanied by the unrestricted ability to smoke anywhere." *Id.* at 479. The Court can ascertain no means by which its analysis could be affected by the identity of the plaintiff or the allegations raised in this case. Consequently, any First Amendment claim related to Players', or its members', freedom of speech must also be rejected.

### 4. *Due Process*

▆ Finally, Players argues that the Smoking Bans violate the Due Process Clause of the Fourteenth Amendment because "[t]he premise underlying the enactment of both Local Law 47 and Chapter 13, respectively—that secondhand smoke has proven to kill people—is false and was known to be false by the City of New York and the State of New York, prior to the enactment" of the statutes. (Am. Compl.¶ 66.) According to Players, allegations made by Defendants "as to the purported lethal impact of secondhand smoke, have no scientific basis whatsoever." (*Id.* ¶ 72.)

The Court does not need to consider this argument in great detail, having already

concluded in *CLASH* that the Smoking Bans should be subject to, and should survive, rational basis review. In that suit as well as this one, the application of Equal Protection Clause to the classifications challenged in the suits gave rise to rational basis review. Rational basis review also applies to Due Process challenges to public health, safety, and welfare legislation such as the Smoking Bans, allowing such legislation to survive constitutional scrutiny unless Players can show that it "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense." *Nectow v. City of Cambridge*, 277 U.S. 183, 187–88, 48 S.Ct. 447, 72 L.Ed. 842 (1928) (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). As stated in the foundational case of *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955), for a law to survive scrutiny under this standard, "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

The State and City have put forward a substantial volume of scientific data, expert opinions, and other materials, both in *CLASH* and in this case, indicating that secondhand smoke represents "an evil at hand for correction." *Id.* Moreover, the statutes' increased restrictions on smoking in locations where individuals could be subjected involuntarily to secondhand smoke certainly represents a "rational way to correct" that evil. *Id.* It is thus immaterial whether Players is able to introduce additional reports questioning these conclu-

---

evidence suggesting that either the Smoking Bans are intimidating its membership or

coercing individuals to avoid participating in or becoming members of the club.

sions that were not already cited by the plaintiffs and reviewed by the Court in *CLASH*. The Court concluded in *CLASH* that "New York State's and New York City's stated basis for enacting the Smoking Bans—protecting its citizenry from the well-documented harmful effects of ETS [*i.e.*, secondhand smoke]—provides a sufficient rational basis to withstand CLASH's constitutional challenges." *CLASH*, 315 F.Supp.2d at 492. As Players conceded at the April 28 Hearing, that conclusion is similarly applicable in this case.

### III. *CONCLUSION*

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendant the City of New York for summary judgment dismissing the Amended Complaint of plaintiff The Players, Inc. d/b/a The Players ("Players") in this action is granted; it is further

**ORDERED** that the motion of defendants Eliot Spitzer, in his official capacity as Attorney General of the State of New York and Antonia C. Novello, in her official capacity as Commissioner of the New York State Department of Health, for summary judgment dismissing the Amended Complaint of Players in this action is granted; and it is finally

**ORDERED** that the cross-motion of Players seeking further discovery pursuant to Fed.R.Civ.P. 56(f) is denied.

The Clerk of Court is directed to close this case, and any open motions.

**SO ORDERED.**